857 F.2d 267
 23 Soc.Sec.Rep.Ser. 47, Medicare&Medicaid Gu 37,489
AMERICAN MEDICAL ASSOCIATION, et al., Plaintiffs-Appellants,
v.
Otis R. BOWEN, M.D., Secretary of the Department of Health
and Human Services, Defendant-Appellee,
and
American Association of Retired Persons, et al.,
Intervenors-Appellees.
 No. 87-1755.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 14, 1988.
 
 Jack R. Bierig, Chicago, Ill., for American Medical Ass'n.
 Donald P. Wilcox, Austin, Tex., for Texas Medical Ass'n.
 Richard E. Gray, Dallas, Tex., for American Medical Ass'n, et al.
 David F. Graham, Sidley & Austin, Chicago, Ill., for plaintiffs-appellants.
 Scott McIntosh, Dept. of Justice, Appellate Staff, Civil Div., Washington, D.C., for Bowen.
 Douglas N. Letter, Atty., Sp. Lit., D of J, Washington, D.C., for Otis Bowen.
 David Overlock Stewart, Washington, D.C., Sharon N. Freytag, Dallas, Tex., Alfred J. Chiplin, Burton D. Fretz, Washington, D.C., for intervenors.
 Appeal from the United States District Court for the Northern District of Texas.
 Before WISDOM, GEE and JONES, Circuit Judges.
 EDITH H. JONES, Circuit Judge:
 
 
 1
 Appellants, seven individual doctors and three medical societies representing physicians nationally, in Texas, and in Lubbock-Crosby-Garza counties, challenge provisions of the Medicare program enacted as Sec. 9331 of the Omnibus Budget Reconciliation Act (OBRA) of 1986. Pub. L. 99-509, 100 Stat. 2018 (42 U.S.C. Sec. 1395u). Appellants allege that the Secretary's method of implementing OBRA in late 1986 forced physicians to choose whether or not to "participate" in the program in 1987 without knowing exactly how much they would be allowed to charge Medicare patients as non-participants and exposed non-participants to sanctions for overcharging Medicare patients, all in violation of the due process clause of the Fifth Amendment. Appellants also contend that certain regulations were promulgated pursuant to the statute without following the notice and comment requirements of the Administrative Procedure Act (APA). 5 U.S.C. Sec. 553. We conclude that the Fifth Amendment claim (1) is moot and lacks a reasonable expectation of recurrence to the extent that it complains of the participation choice and (2) is not ripe to the extent that it complains of the exposure to sanctions. We further find that Appellants lack standing to bring the APA claim because they were not injured by the agency action. Accordingly, we affirm on different grounds the district court's judgment dismissing these claims.
 
 BACKGROUND
 A. Participation Decision
 
 2
 The facts in this case, although more complex than our legal analysis, provide a necessary backdrop to what follows. The Medicare Program furnishes two distinct alternative means of reimbursement for physicians' services. A physician can charge his patients "on the basis of an itemized bill," 42 U.S.C. Sec. 1395u(b)(3)(B)(i), following which Medicare reimburses the patient 80% of the doctor's "reasonable charge."[1] 42 C.F.R. Sec. 410.152. The patient ends up paying the difference between the actual charge and 80% of the "reasonable charge."
 
 
 3
 Otherwise, the physician can "accept assignment," pursuant to 42 U.S.C. Sec. 1395u(b)(3)(B)(ii), and thereby bill the Medicare carrier directly for 80% of the "reasonable charge," leaving the patient initially responsible for the remaining 20% of the "reasonable charge." The doctor, however, agrees to accept no more than the "reasonable charge" for his services.
 
 
 4
 Originally, the Medicare Act permitted doctors to choose whether to accept assignment on a case-by-case basis. Legislation enacted in 1984, however, required every doctor periodically to decide whether to sign a "participation agreement" and thereby to accept assignment for all services furnished to Medicare Part B recipients during the following year.[2] A physician who did not sign a participation agreement remained free to accept assignment on a case-by-case basis. The same statute temporarily froze the fees that non-participating physicians could charge to Medicare beneficiaries and so controlled those fees from July 1, 1984 through December 31, 1986. Additionally, non-monetary incentives, such as Medicare directories listing only participating physicians, were included to encourage physicians to sign participation agreements. See, e.g., 42 U.S.C. Sec. 1395u(h) (2)-(6).
 
 
 5
 This litigation was spawned, paradoxically, by the law that terminated the price freeze but substituted a new form of price control for non-participating doctors. Section 9331 of the Omnibus Budget Reconciliation Act ("OBRA") of 1986, Pub.L. No. 99-509, 100 Stat. 1874, 2018-22 (1986), caps non-participating physicians' charges to Medicare beneficiaries according to the newly-invented "maximum allowable actual charge" ("MAAC"). 42 U.S.C. Sec. 1395u(j)(1)(B)(i). While the "reasonable charge" formula for reimbursement of participating physicians remained constant after OBRA, the MAAC significantly altered the reimbursement formula for non-participating physicians in a way that only legislators and accountants can appreciate. To say that the calculation of individual MAAC's by every physician for every medical service that may be performed (some 10,000 in all) is complex is to understate the matter ridiculously.[3]
 
 
 6
 Congress enacted OBRA on October 21, 1986. The act required physicians to make their 1987 participation decision by January 1, 1987. However, the Health Care Financing Administration, the sub-agency of the Department of Health and Human Services ("HHS") which administers Medicare, did not require that MAACs be supplied to non-participating physicians until March 1, 1987. HHS instructed the health insurance carriers that administer the Medicare plan to respond to physicians' requests for information within three working days.[4] Unfortunately, many of the physicians who actually requested the information necessary to compute their MAACs did not receive it prior to the participation deadline.
 
 
 7
 Although the district court found that "no doctor [was] without at least some means for estimating his 1987 MAAC," most physicians could not precisely calculate their MAACs prior to the participation decision deadline. 659 F.Supp. 1143, 1147. Even if a physician's records contained his charges to Medicare beneficiaries for the 1984 base quarter, he would lack two key parts of the calculation. First, he would not have known the "prevailing charges" for each service. Second, he would not know in which of the approximately 10,000 categories the carrier has classified his services. Moreover, physicians were probably unable to determine the "reasonable charge" that participating physicians would be allowed to charge. Thus, physicians were left with only a rough estimate of the fee limit differences between participating and non-participating status at the participation decision deadline.
 
 
 8
 This is not the end of the story. Congress made further changes to the Medicare program in the OBRA of 1987. Pub.L. No. 100-203, 101 Stat. 1330. Congress avoided the transitional problems caused by the 1986 Act by extending the effectiveness of the 1987 participation agreements and fee ceilings through the first quarter of 1988. Pub.L. No. 100-203, Sec. 4041, 101 Stat. 1330-83. With this extra time, HHS was able to provide physicians with updated customary and prevailing charges and MAACs more than a month before the April 1, 1988 participation decision deadline. HHS "Dear Doctor Letter" 4 Medicare and Medicaid Guide (CCH) Sec. 37,006 (1988).
 
 
 9
 The crux of appellants' complaint is the way in which the MAAC fee limits were folded into the existing Medicare payment system. Appellants contend that they were forced by HHS to make 1987 participation decisions in the dark, without knowing or having the ability to ascertain what their MAACs would be, and consequently without knowing whether Medicare reimbursement would be higher for participants or non-participants. This necessity for blind decisionmaking, together with warnings by HHS that non-participating doctors whose 1987 charges exceeded their MAACs would be subject to enforcement proceedings, underlie the appellants' due process claim. They thus contend that their statutory right to make "voluntary" participation decisions, 42 U.S.C. Sec. 1395u(h), was denied by the implementation of MAACs, and that they were effectively coerced into signing participation agreements.
 
 B. Actual Charge Calculation
 
 10
 The calculation of a MAAC depends in part on a doctor's "actual charge" for a procedure during the 1984 base period. Section 9331 provides that the actual charge for this purpose shall be "the weighted average (or, at the option of the Secretary ..., the median)" of his charges for the service during the base period. OBRA Sec. 9331(b) (codified at 42 U.S.C. Sec. 1395u(j)(1)(C)(vi)). HHS chose the median method of calculating actual charges because it was the easier method for carriers to compute. No APA notice and comment procedures were used to make this choice. However, HHS noted that the median was chosen for "operational" rather than "policy" reasons and that "it would be inappropriate to disadvantage any physician who is adversely affected by the selection and who wishes to charge in accordance with a self-calculated MAAC based on a weighted average of the base quarter charges." 52 Fed.Reg. 1383, 1384. The notice provides further "that no sanction action will be initiated against a physician if it is determined that the physician would have been in compliance had the weighted average been used." Id.
 
 DISCUSSION
 A. The Due Process Claims
 1. Participation Decision Issue is Moot
 
 11
 We decline to reach the merits of appellants' due process challenge to the implementation of Sec. 9331. If a dispute has been resolved or if it has evanesced because of changed circumstances, including the passage of time, it is considered moot. Matter of S.L.E. Inc., 674 F.2d 359, 364 (5th Cir.1982). With the designation of mootness comes the concomitant designation of non-justiciability. Id. Jurisdiction is still proper, however, if there is a reasonable likelihood that the same controversy will recur. Honig v. Doe, --- U.S. ----, 108 S.Ct. 592, 601 and n. 6, 98 L.Ed.2d 686 (1988).
 
 
 12
 There can be little dispute in this case that the immediate controversy ended with the passing of the 1987 participation decision deadline and the one-year period for which that decision was effective. Appellants argue that declaratory relief could still be granted even though injunctive relief is no longer available. Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974). However, Super Tire differs from this case in that an immediate controversy existed for the declaratory judgment to address. In that case, an employer alleged that a state's grant of public assistance to striking workers constituted interference with the federal labor policy of free collective bargaining. The particular strike in question ended, thus mooting claims for injunctions against the relief. Yet, the continuing state policy of making the assistance available had a continuing effect on collective bargaining. The court concluded that jurisdiction would be proper since the plaintiff could "show the existence of an immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest." 416 U.S. at 125-26, 94 S.Ct. at 1700.
 
 
 13
 Conversely, a declaratory judgment would have no immediate effect in this case. The consequences of the 1987 participation decision can no longer practically be changed.[5] Furthermore, physicians appear to have received timely information with which to make their decisions for 1988. The possibility that MAAC information will not be available before participation decision deadlines in coming years is speculative and has no impact on physicians' ongoing practice.
 
 
 14
 Nor does this case come within the exception to the mootness rule as being "capable of repetition, yet evading review." See Ill. State Bd. of Elec. v. Socialist Workers, 440 U.S. 173, 187, 99 S.Ct. 983, 992, 59 L.Ed.2d 230 (1979). In that case, the Illinois Board of Elections disputed the authority of the Chicago Board of Elections to execute a settlement agreement concerning the signature requirement and filing deadline for placing a candidate on the ballot in a particular election. The Supreme Court concluded that the claim was moot and that there was no reasonable expectation that the Chicago Board would repeat the questioned action in subsequent elections. The Court reasoned that the action reflected neither a policy the Board had determined to continue nor a consistent pattern of behavior nor an action patently prescribed by statute. Id.
 
 
 15
 The present case is analogous to Socialist Workers in that the dispute concerns actions arising from an unusual set of facts that are unlikely to recur. HHS's failure to provide physicians with timely MAAC information can not be said to reflect either a policy of HHS or a consistent pattern of behavior. Indeed, timely information has apparently been provided for the 1988 participation decision, and as each succeeding year's MAACs evolve from those of the past year, the calculations should become more readily ascertainable. Rather, the difficulty in providing the information before the 1987 participation decision appears to have been created by the timing of the underlying legislation. Congress provided little more than two months between passage of the OBRA of 1986 and the 1987 participation deadline. There is no reason to expect similar difficulties in the future. Congress itself may have learned from the unsatisfactory 1986 experience as it provided adequate time to implement the changes to the Medicare program enacted as part of the OBRA of 1987.
 
 
 16
 2. The Issuance of Sanctions for Overcharging is not Ripe
 
 
 17
 Appellants also assert that non-participating physicians who charged in excess of their MAACs before the MAACs were distributed should not be subject to sanctions on account of such overcharging. As the district court correctly held, this claim is not ripe.
 
 
 18
 The ripeness doctrine is necessary to prevent courts from becoming entangled in abstract disputes by adjudicating an issue prematurely. Thomas v. Union Carbide Agr. Products Co., 473 U.S. 568, 580, 105 S.Ct. 3325, 3332, 87 L.Ed.2d 409 (1985). The doctrine discourages the litigation of contingent events that either may not occur at all or, at least, may not occur as anticipated. Id. at 3333. In addition, the fitness of an issue for judicial decision and the hardship to the parties of delaying adjudication should be considered in the ripeness analysis. Id.
 
 
 19
 This case is analogous to that faced by the Supreme Court in Hodel v. Virginia Surface Min. & Reclamation Ass'n., 452 U.S. 264, 303-04, 101 S.Ct. 2352, 2374-75, 69 L.Ed.2d 1 (1981). There, coal producers challenged the constitutionality of the civil penalty provisions of the Surface Mining Control and Reclamation Act of 1977. Pub.L. No. 95-87, 91 Stat. 445 (1977). The coal producers did not allege that any such penalties had been assessed. In addition, the district court in that case did not find that any coal producers had been affected by the penalty provisions. The Court held that no concrete case or controversy concerning the operation of the penalty provisions existed. Id.
 
 
 20
 Similarly, Appellants do not contend that any physician has yet been personally threatened with sanctions. Section 9331 of OBRA only authorizes discretionary sanctions against physicians who "knowingly and willingly" exceed their MAACs.[6] Thus, it appears quite remote that HHS would seek to sanction a physician for exceeding MAACs of which he was unaware.
 
 
 21
 The question of the enforceability of such sanctions for overcharging also remain unfit for a judicial determination in the absence of factual development. Any decision by HHS to impose sanctions would inevitably require an inquiry into the physician's knowledge of the proper fee limits. A physician could conceivably have charged such a sufficiently high fee that he would have known that it would exceed any MAAC that was eventually distributed. Moreover, Appellants have alleged no facts establishing that physicians would suffer any hardship from not having this issue decided now.
 
 B. APA Claim
 
 22
 Appellants lack standing to challenge HHS's adoption of the median method for calculating actual charges. While an organization whose members are injured by government action may represent those members in a proceeding for judicial review, the members must allege facts showing that they were adversely affected by the government action. See Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). This Circuit has established a three-part test for determining the existence of standing to challenge agency actions: (1) the action must result in injury-in-fact to the plaintiffs, (2) the interest invaded must be arguably within the zone of interest to be protected by the statute, and (3) there must be no statutory prohibition of judicial review. Baker v. Bell, 630 F.2d 1046, 1050 (5th Cir.1980). Appellants fail the first part of the test.
 
 
 23
 While the use of the median calculation will likely lead to lower distributed MAACs for some physicians than if the weighted average calculation were used, HHS has expressly stated that no enforcement actions will be initiated against such physicians if their charges would not exceed a MAAC calculated under the weighted-average method. Thus, no physician has been required to charge a lower fee as a result of HHS's action. Indeed, physicians effectively got their choice of the higher of the two possible fee limits, for 1987, under the HHS's action, arguably a more generous result than that contemplated by the statute itself. The only conceivable "injury" to any physician would be the expense of calculating the MAACs under the weighted-average method. Appellants have not even bothered to allege the existence of such an expense, and it is likely to be so small so as to be insufficient to trigger this court's jurisdiction under Article III of the Constitution.
 
 
 24
 For these reasons, the federal courts lack jurisdiction to consider any of Appellant's claims. The decision of the district court is VACATED and Appellant's appeal is DISMISSED.
 
 
 
 [1]
 "Reasonable charge" is generally the lowest of (a) the doctor's actual, billed charge; (b) the doctor's "customary charge" to other Medicare beneficiaries for similar services, determined according to a profile developed administratively for that doctor; and (c) the locally "prevailing charge recognized by the carrier" for similar services provided by doctors to Medicare beneficiaries. 42 U.S.C. Sec. 1395u(b) (3). Because the prevailing charge is determined by applying a Medicare cost-of-living index to 1973 base rates, it is ordinarily much lower than physicians' actual, current charges and skews the "reasonable charge" downward
 
 
 [2]
 Section 2306 of the Deficit Reduction Act of 1984, Pub.L. No. 98-369, 98 Stat. 494, 1070-73, 42 U.S.C. Sec. 1395u(h)(1) (1984)
 
 
 [3]
 Each doctor's MAACs must be calculated for each procedure he performs for a Medicare patient. First, the doctor must determine whether he submitted charges to Medicare for the particular service [classified from among approximately 10,000 service codes] in the second quarter of 1984. If so, his MAAC for that base period on that service is computed by comparing his actual charge billed to Medicare patients during that base period with 115% of the current year's "prevailing charge." The "prevailing charge," in turn, depends on the 1973 rate for services updated by the Medicare Economic Index and adjusted locally by Medicare carriers on a procedure-by-procedure basis. The carriers normally maintain "prevailing charge" information. If a doctor finds that his 1984 base period actual charge equals or exceeds 115% of the prevailing charge for nonparticipating physicians, the MAAC is 101% of the base period charge. 42 U.S.C. Sec. 1395u(j)(1)(C). If his base period actual charge is less than 115% of the prevailing charge, a different formula applies
 Two variations in the MAAC calculation introduce additional complexity. First, if a doctor charged different amounts to more than one Medicare patient for the same service during the base period, OBRA Sec. 9331 authorized the Department of Health and Human Services to fix his MAAC according to either the weighted average or the median charge. This uncertainty is another subject of appellants' lawsuit. Second, in many instances a doctor may have made no charges to Medicare patients for a particular service within the base period. (For instance, the doctor may not have been in private practice then, he may not have performed the service for a Medicare patient, or the service may not have existed.) In such cases, the base period charge is replaced by "the 50th percentile of the customary charges for the service (weighted by the frequency of the service) performed by nonparticipating physicians in the locality in the 12-month period ending June 30 of the previous year." 42 U.S.C. Sec. 1395u(j)(1)(C)(v). The MAAC formula then remains the same. Medicare carriers are the repositories of information concerning the 50th percentile charges.
 Given the intricacy, intrusiveness and constant fluctuations of these price control measures, it is no wonder that top students are being deterred in droves from applying to medical schools. See New York Times, p. 1 Sunday, August 14, 1988.
 
 
 [4]
 Carriers were instructed to make available no later than November 15, 1986, certain information necessary to make an informed participation decision under OBRA: the customary charges, the prevailing charges for participants and the prevailing charges for non-participants
 
 
 [5]
 Appellants suggest in their reply brief that the 1987 participation decision could be reopened and the Medicare reimbursements adjusted accordingly. They had not previously urged such relief and do not offer any specific proposal as to how the reimbursements would be adjusted. We see no way to practically make such adjustments. There is no way of knowing accurately which, if any, physicians would have made a different participation choice if they had possessed the fee limit information earlier. The non-monetary consequences of the participation choice, such as special directories and faster reimbursement for participating physicians, cannot be adjusted. Most significantly, physicians would face a virtually insurmountable challenge in trying to bill their patients retroactively should they now revoke their 1987 participation agreements
 
 
 [6]
 42 U.S.C. Sec. 1395u(j)