976 F.2d 812
 61 USLW 2211, 39 Soc.Sec.Rep.Ser. 11,
Medicare & Medicaid Guide P 40,808
 MEDICAL SOCIETY OF the STATE OF NEW YORK, American Medical
Association and Isadore Rosenfeld, M.D.,
Plaintiffs-Appellants,
v.
Mario M. CUOMO, Governor of the State of New York,
individually in his official capacity and David M. Axelrod,
Commissioner of New York Department of Health, individually
in his official capacity, Defendants-Appellees.
 No. 1634, Docket 91-9364.
 United States Court of Appeals,
Second Circuit.
 Argued June 5, 1992.
Decided Sept. 24, 1992.
 
 Richard D. Raskin, Chicago, Ill. (Jack R. Bierig, Chicago, Ill., Steven M. Bierman, New York City, Donald R. Moy, Lake Success, N.Y., Kirk B. Johnson, Edward B. Hirshfeld, Michael L. Ile, Chicago, Ill., of counsel), for plaintiffs-appellants.
 Brian T. McGovern, Asst. Atty. Gen., State of N.Y., New York City (Robert Abrams, Atty. Gen., State of N.Y., of counsel) for defendants-appellees.
 Yisroel Schulman, New York Legal Asst. Group, New York City, submitted an amici curiae brief for New York Statewide Senior Action Council, Citizen Action of New York, New York State Coalition of the Concerned for Older Americans, New York State Council of Senior Citizens, Brooklyn-Wide Interagency Council of the Aging, Institute of the Puerto Rican/Hispanic Elderly, and Joint Public Affairs Committee for Older Adults.
 Before: OAKES, Chief Judge,* McLAUGHLIN, Circuit Judge, and LAY, Senior Circuit Judge.**
 McLAUGHLIN, Circuit Judge:
 
 
 1
 Plaintiffs, the Medical Society of the State of New York, the American Medical Association, and Isadore Rosenfeld, M.D. ("Appellants") appeal from a judgment entered in the United States District Court for the Southern District of New York (Charles S. Haight, Jr., Judge ) granting summary judgment to the State of New York and Doctor David M. Axelrod, Commissioner of the New York Department of Health (collectively "the State" or "New York").
 
 
 2
 New York enacted Chapter 572 of the Laws of New York in July of 1990, with an effective date of January 1, 1991. N.Y.Pub. Health Law § 19 (McKinney Supp.1992). Chapter 572 limits the amount that a physician may charge to beneficiaries under the Health Insurance for the Aged Act ("Medicare Act" or "the Act") 42 U.S.C. §§ 1395c-1395w. Appellants challenged Chapter 572 in the district court on the ground, inter alia, that it is preempted by the Medicare Act[1]. Both sides moved for summary judgment, and the district court granted the State's motion, holding that Chapter 572 is not preempted by the Act. We agree with the district court and, therefore, affirm.
 
 BACKGROUND
 
 3
 The facts of this case are ably set forth in the district court's comprehensive opinion, reported at 777 F.Supp. 1157 (S.D.N.Y.1991), familiarity with which is assumed.
 
 The Medicare Act
 
 4
 The Medicare program was established in 1965 to pay for the medical care of the aged and certain disabled individuals. 42 U.S.C. § 1395c. Part B of the Act, § 1395j-1395w, addresses doctors' bills and establishes a voluntary, federally subsidized program of supplementary medical insurance, generally reimbursing beneficiaries for part of the cost of certain doctors' services, x-rays, lab tests, and other medical services. See generally Isaacs v. Bowen, 865 F.2d 468, 470 (2d Cir.1989) (discussing Medicare Part B reimbursement procedure). The Secretary of Health and Human Services contracts with private insurance carriers who administer the Part B claim process. 42 U.S.C. § 1395u. The Act provides beneficiaries coverage for 80% of the "reasonable charge" for a particular medical service or procedure.[2] The beneficiary is responsible for the remaining 20%.
 
 
 5
 Physicians participating in Part B may choose between two payment options: "assignment billing" and "balance billing." Id. at § 1395u(b)(3)(B). Under the former, physicians accept the reasonable charge for a given service thereby assuring that the Medicare payments will be made directly to them. Id. at § 1395u(b)(3)(B)(ii). Under the latter, physicians charge "on the basis of an itemized bill," and they are not limited to the reasonable charge. Id. at § 1395u(b)(3)(B)(i). Under balance billing, however, Medicare does not pay the physician directly. Rather, Medicare pays the patient 80% of the reasonable charge for the services rendered, and the physician must look only to the patient for his fee.
 
 
 6
 Balance billing has always been controversial. Opponents contend that many beneficiaries are victimized by the process because they are unaware of the insurance options and often do not know that their physicians "balance bill" until after services have been rendered. They also contend that balance billing thwarts Medicare's goal of reducing health care costs for beneficiaries because it invariably increases the amount charged to the beneficiary personally. Because this amount is generally not covered by other types of insurance, "extra bills become out-of-pocket liabilities" of the patient. Physicians Payment Review Commission ("PPRC") 1988 Annual Report to Congress at 130.
 
 
 7
 Congress has repeatedly tried to discourage balance billing. The Deficit Reduction Act of 1984 ("DEFRA") created the "Participating Physician's Program," requiring physicians either to accept assignment billing for all Medicare billings in a given year (thereby becoming a "participating physician"), or to balance bill in every case (a "non-participating physician"). Incentives were created to nudge the physicians into becoming participating physicians, and a cap was placed on the fees that a non-participating physician could charge to Medicare beneficiaries. 42 U.S.C. §§ 1395u(b)(4)(A)(iv), 1395u(j)(1); see also Pennsylvania Medical Soc'y v. Marconis, 942 F.2d 842, 844 (3d Cir.1991); American Medical Ass'n v. Bowen, 857 F.2d 267, 268 (5th Cir.1988).
 
 
 8
 The Omnibus Budget Reconciliation Act of 1986 ("OBRA '86") lifted the cap and replaced it with a series of Maximum Allowable Actual Charges ("MAAC"s) limiting the annual increase that non-participating physicians could charge for each service rendered to Medicare beneficiaries. See 42 U.S.C. § 1395u(j)(1)(C); Bowen, 857 F.2d at 268-69. OBRA '86 also established the Physician Payment Review Commission to recommend annual rates and methods of payment for Medicare services. Id. §§ 1395w-1(a) and (b)(1).
 
 
 9
 The PPRC has twice described balance billing as a "safety valve" against the deterioration of services provided to Medicare beneficiaries. PPRC, 1988 Annual Report to Congress 173; PPRC, 1989 Annual Report to Congress 137. However, in its 1989 report, the PPRC also recommended that a national fee schedule be substituted for the reasonable charge standard and that balance billing charges be limited to a fixed percentage of the fee schedule amount. PPRC, 1989 Annual Report to Congress 137. Following its consideration of the 1989 PPRC report, Congress placed additional restrictions on physicians who balance bill in the Omnibus Budget Reconciliation Act of 1989 ("OBRA '89"). The most significant of these changes was the imposition of "limiting charges" on non-participating physicians. Under this system, a cap of 125%, (or in some cases 140%) of the "recognized payment amount"[3] for a particular service was imposed for 1991. The limiting charge was lowered to 120% for 1992, and 115% for 1993 and thereafter. § 1395w-4(g)(2).
 
 State Legislation
 
 10
 The Medicare program "is funded entirely by the federal government," and "[t]raditionally, states have played no role in setting Medicare rates and handling Medicare payments." See Rebaldo v. Cuomo, 749 F.2d 133, 135 (2d Cir.1984), cert. denied, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985). Nevertheless, two states, Massachusetts and Pennsylvania, led a movement to effectively prohibit balance billing. Mass.Gen.L. ch. 112 § 2 (1990); Pa.Stat.Ann. tit. 35, § 449.31 et seq. (Purdon Supp.1991).
 
 
 11
 The 1985 Massachusetts statute made the disavowal of balance billing a condition to the issuance or renewal of a license to practice medicine. The American Medical Association, Massachusetts Medical Society, and an individual doctor challenged the statute in the United States District Court for the District of Massachusetts on due process and preemption grounds. The court upheld the statute and dismissed the action, and the First Circuit affirmed. Massachusetts Medical Soc'y v. Dukakis, 637 F.Supp. 684 (D.Mass.1986), aff'd, 815 F.2d 790 (1st Cir.), cert. denied, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987).
 
 
 12
 Following the First Circuit's decision, Connecticut, Rhode Island, and Vermont enacted laws limiting balance billing, and this legislation was explicitly described to Congress in the PPRC's 1989 Report. See PPRC, 1989 Annual Report to Congress 371-73. The Report also noted that eighteen other states, including New York, had considered, but failed to pass, legislation regulating balance billing. Id. at 371. In 1989, the United States General Accounting Office ("GAO"), the investigative arm of Congress, issued a report on the impact of the "mandatory assignment" laws in the four states which had adopted them. GAO, Medicare Impact of State Mandatory Assignment Billing Program on Beneficiaries (September 1989).
 
 
 13
 Following both the PPRC and GAO reports, OBRA '89 was passed, and it made no attempt to abridge state regulation of balance billing. Indeed, the House Ways and Means Committee that authorized the legislation establishing the limiting charges said in its Report to the full Congress that "[t]he Committee intends that nothing in this section would prejudice the right of any state to require assignment on Medicare claims as a condition of licensure in the State." H.R.Rep. No. 247, 101st Cong., 1st Sess. 1008 (1989), reprinted in 1989 U.S.C.C.A.N. 1906, 2479.
 
 
 14
 Following the passage of OBRA '89, Pennsylvania enacted a law flatly prohibiting balance billing. Pa.Stat.Ann. tit. 35, § 449.31 et seq. (Purdon Supp.1991). The American Medical Association, local medical associations, and an individual doctor challenged the law on preemption grounds, but the district court upheld the statute and the Third Circuit affirmed. Pennsylvania Medical Soc'y v. Marconis, 755 F.Supp. 1305 (W.D.Pa.1991), aff'd, 942 F.2d 842 (3d Cir.1991).
 
 New York Legislation
 
 15
 In 1990, New York enacted Chapter 572, which capped the charge for physicians who balance bill federal Medicare beneficiaries at 115% of the Medicare allowable charge as of 1991. The limit will be reduced to 110% after 1992, or 105% if the number of statewide Medicare claims billed at or below the Medicare allowable charge does not increase by 5% from the previous year's level. N.Y.Pub.Health Law § 19(1)(a)-(b). A physician who violates Chapter 572's charge limitations is subject to a fine of between $1,000 and $5,000, and must make restitution to the patient for the excess amount charged. Id. at § 19(4).
 
 
 16
 The American Medical Association, the Medical Society of New York, and an individual doctor brought this suit to challenge the statute on the ground, inter alia, of preemption. The district court rejected the preemption argument and granted the defendants' motion for summary judgment. This appeal followed.
 
 DISCUSSION
 
 17
 In considering a preemption claim, our "sole task" is to determine the intent of Congress. California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). Congress may convey its intent to preempt state law either through an express preemption clause or through the structure and purposes of its legislation. Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). The Medicare Act contains no provision that expressly prohibits states from balance billing. The appellants contend that Chapter 572 is nevertheless preempted because it impermissibly intrudes in a field that Congress has fully occupied, and because it conflicts with the Act.
 
 
 18
 We begin by considering whether Chapter 572 addresses an area traditionally occupied by the states. This focus is enlightening, because where " 'Congress legislate[s] in a field which the States have traditionally occupied.... [W]e start with the assumption that the historic police powers of the States were not to be superseded by the [federal legislation] unless that was the clear and manifest purpose of Congress.' " Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 206, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752 (1983) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)) (emphasis added). Accordingly, we have required "compelling evidence of an intention to preempt" in traditionally state-regulated fields. General Motors Corp. v. Abrams, 897 F.2d 34, 41-42 (2d Cir.1990); see Environmental Encapsulating Corp. v. City of New York, 855 F.2d 48, 56 (2d Cir.1988). The assumption that Congress does not intend preemption in such areas springs from the cognate presumption that Congress does not normally intend to displace state law. Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981).
 
 
 19
 The regulation of public health and the cost of medical care are virtual paradigms of matters traditionally within the police powers of the state. Hillsborough County v. Automated Medical Lab. Inc., 471 U.S. 707, 719, 105 S.Ct. 2371, 2085, 85 L.Ed.2d 714 (1985) ("the regulation of health and safety matters is primarily and historically a matter of local concern"); see also Rebaldo v. Cuomo, 749 F.2d at 138 ("The containment of hospital [medical] costs is an exercise of a state's police powers, which should not be superseded by federal regulations unless that was the clear intent of Congress.") Pennsylvania Medical Soc'y v. Marconis, 942 F.2d 842, 847 (3d Cir.1991) (statute banning balance billing entitled to presumption of validity because "[t]he licensing and regulation of physicians is a state function").
 
 
 20
 Appellants concede that Chapter 572 "touches upon" the traditionally state-regulated areas of public health and the cost of medical care. They argue, however, that, because Chapter 572 regulates only Medicare fees, rather than medical costs in general, the statute is specifically designed to impinge upon a federal regulatory program and is therefore not entitled to any deference. As support for this proposition, they cite Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988), and Rebaldo v. Cuomo, 749 F.2d 133 (2d Cir.1984), cert. denied, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985). Appellants' reliance on the Schneidewind and Rebaldo cases is misguided.
 
 
 21
 In Schneidewind, several energy companies raised a preemption challenge to a Michigan statute requiring federally-regulated natural gas companies to obtain state approval before issuing certain long-term securities. The plaintiffs objected that the statute sought to traverse a field over which Congress had claimed exclusive control in the Natural Gas Act of 1938. Michigan defended the statute as just a traditional state "blue sky" law, with only minimal, indirect effects on the federal statutory regime under which the Federal Energy Regulatory Commission ("FERC") controls the interstate sale and transportation of gasoline. The Supreme Court, however, concluded that the state statute impermissibly trespassed in a field exclusively occupied by the Natural Gas Act, describing the act as a "comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce.' " Schneidewind, 485 U.S. at 300, 108 S.Ct. at 1151 (quoting Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 682, 74 S.Ct. 794, 799, 98 L.Ed. 1035 (1954)).
 
 
 22
 The Court noted that the Michigan statute had, as its "central purpose ... to regulate matters that Congress intended FERC to regulate." Schneidewind, 485 U.S. at 309, 108 S.Ct. at 1155. It further observed that "while the [enabling legislation] does not expressly grant FERC pre-issuance authority over the securities of natural gas companies," FERC effectively obtained such authority through the grant of other express rights by Congress. Id.
 
 
 23
 In Schneidewind, there was no doubt that Congress intended to preempt all state regulation in the field of rates and facilities of natural gas companies. The only question was whether the state security law at issue entered the occupied field. Id. at 308, 108 S.Ct. at 1155. Here, by contrast, the dispute centers on the core question of whether Congress intended to occupy the whole field and to preempt state limits on balance billing. As the Marconis court said:
 
 
 24
 While the non-neutral statute at issue in Schneidewind was not entitled to the presumption of validity it was because congressional intent otherwise was clear. No such clarity exists here. The licensing and regulation of physicians is a state function. See, e.g., Massachusetts Medical Society v. Dukakis, 815 F.2d at 791. Appellants have failed to prove otherwise. Thus, the state regulation is presumed valid.
 
 
 25
 Marconis, 942 F.2d at 847.
 
 
 26
 The appellants' reliance on our own decision in Rebaldo, is likewise misplaced. In Rebaldo, unlike the present case, there was an express preemption provision within the federal ERISA legislation at issue. Nevertheless, we held that a New York statute prohibiting hospitals from establishing inpatient charges for self-insured employee benefit plans was not preempted because the state statute was generally applied and had only "some economic impact" on the federal plan. Rebaldo, 749 F.2d at 139. Significantly, the "presumption of validity" issue was of little consequence in Rebaldo because that dispute centered on express--not implied--preemption. Id. at 134-35. Because Chapter 572 regulates a field traditionally governed by state legislation, we accord it a presumption of validity.
 
 The Preemption Arguments
 
 27
 In the absence of an express preemption clause, the courts have blazed two other trails to determine whether it was the congressional intent to preclude state law: implied preemption ("occupation of the field"); and conflict preemption. See Schneidewind, 485 U.S. at 300, 108 S.Ct. at 1150. Appellants invoke both doctrines.
 
 A. Implied Preemption
 
 28
 Appellants' emphasize the elaborate architecture of the Medicare statute, including recent amendments relating to balance billing. See, e.g., 42 U.S.C. § 1395w-4(g)(1) & (3) (1989). They argue that the Medicare Act and its accompanying regulations are "sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation." Hillsborough County, 471 U.S. at 713, 105 S.Ct. at 2375 (1985) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).
 
 
 29
 The State also points to the complexity of the Medicare legislation, but argues that because Congress expressed so much of its legislative will in numbing detail, we must assume that it would have included an express preemption provision if preemption had been its desire. Therefore, the State concludes, the absence of such a provision is strong evidence that Congress did not intend to prohibit state regulation of balance billing.
 
 
 30
 The opening provision of the Act states that:
 
 
 31
 Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.
 
 
 32
 42 U.S.C. § 1395.
 
 
 33
 The district court concluded that this language "reveals Congress' intent not to preempt the role of the states in supplementing federal regulation, but rather an intent to preserve it." 777 F.Supp. at 1162. We agree. Despite appellant's protest that this statutory language should be read narrowly, the unambiguous sentiment expressed in the passage seriously undercuts their claim that Congress intended the Act to occupy the field.
 
 
 34
 The district court also took into account the failure of Congress to respond to the First Circuit's decision banning balance billing in the Massachusetts Medical case, or the various state laws passed in its wake, limiting balance billing. 777 F.Supp. at 1162. The appellants argue that congressional silence provides a squishy reed upon which to base congressional intent, and generally their point is well taken. See, e.g., Schneidewind, 485 U.S. at 306, 108 S.Ct. at 1154 (noting the Court's "reluct[ance] to draw inferences from Congress' failure to act."); Zuber v. Allen, 396 U.S. 168, 185, 90 S.Ct. 314, 323, 24 L.Ed.2d 345 (1969) (describing congressional silence as a "poor beacon to follow"). Nevertheless, there are times when courts may properly consider congressional inertia as an expression of legislative will. See New York State Dep't of Social Servs. v. Dublino, 413 U.S. 405, 420-421, 93 S.Ct. 2507, 2516-2517, 37 L.Ed.2d 688 (1973) (finding persuasive evidence against preemption in Congress's failure to preempt certain state laws when it knew of "settled administrative policy" that approved such laws).
 
 
 35
 Here, Congress's conscious acquiescence in state regulation of balance billing is clear. When Congress enacted OBRA '89, twenty-two states had already passed, or at least considered, statutes banning or restricting balance billing. Advised of this by the 1989 PPRC Report, Congress included no specific preemption clause in the 1989 amendments. As the Marconis court concluded:
 
 
 36
 [W]hen Congress remains silent regarding the preemptive effect of its legislation on state laws it knows to be in existence at the time of such legislation's passing, Congress has failed to evince the requisite clear and manifest purpose to supersede those state laws. California Fed. Savings & Loan Ass'n v. Guerra, 479 U.S. at 287-88, 107 S.Ct. at 692-93. Furthermore, in this case the silence is particularly indicative of congressional intent, given the extraordinary oversight of the Medicare program as evidenced by the very existence of the PPRC with its annual reports to Congress and by the frequent amendment of the Medicare Act. Congress has simply not preempted state balance billing restrictions.
 
 
 37
 942 F.2d at 850.
 
 
 38
 Additional evidence against implicit preemption is Congress's failure to act after the First Circuit's 1987 decision upholding a ban on balance billing. Massachusetts Medical Soc'y v. Dukakis, 815 F.2d 790 (1st Cir.1987). We agree with the Marconis court that Congress's acquiescence in the Massachusetts Medical case "at least strongly supports" an inference that Congress did not intend to preempt state laws regulating balance billing. 942 F.2d at 851.
 
 
 39
 Quite compelling is a statement in the House Ways and Means Committee Report incorporated into the House Budget Committee Report accompanying the House version of OBRA '89: "The Committee intends that nothing in this section would prejudice the right of any state to require assignment on Medicare claims as a condition of licensure in the State." H.R.Rep. No. 247, 101st Cong., 1st Sess. 1008 (1989), reprinted in 1989 U.S.C.C.A.N. 1906, 2479. The district court declined to attribute much value to this statement because of the preliminary nature of the report. 777 F.Supp. at 1163. In reaching its conclusion, the court relied specifically on Justice Scalia's reluctance to rely "on small bits of legislative history":
 
 
 40
 As anyone familiar with modern-day drafting of congressional committee reports is well aware, the references ... were inserted, at best by a committee staff member on his or her own initiative, and at worst by a committee staff member at the suggestion of a lawyer-lobbyist; and the purpose of those references was not primarily to inform the Members of Congress what the bill meant ... but rather to influence judicial construction.
 
 
 41
 Id. (quoting Blanchard v. Bergeron, 489 U.S. 87, 98-99, 109 S.Ct. 939, 947, 103 L.Ed.2d 67 (1989) (Scalia, J., concurring).
 
 
 42
 We recognize that a healthy dose of cynicism is salutary when divining legislative intent. Nevertheless, it must be noted that in Blanchard itself, the eight-member majority expressly relied on a Senate Report in interpreting 42 U.S.C. § 1988. 489 U.S. at 91, 96, 109 S.Ct. at 943, 945. The Court has also explicitly said on another occasion that Committee Reports represent the " 'considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation' " and are therefore the "authoritative source for finding the Legislature's intent." Garcia v. United States, 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984) (quoting Zuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 324, 24 L.Ed.2d 345 (1969)).
 
 
 43
 The statement by the House Committee was made after Congress had been informed that states were regulating, and in some cases banning, balance billing. Indeed, the 1989 GAO Report noted the unsuccessful constitutional challenge to the Massachusetts law mandating, as a licensing requirement, that physicians accept assignment. Under these circumstances, we agree with the Third Circuit that "the statement that the amendments were not meant to 'prejudice the right of any state to require assignment on Medicare claims as a condition of licensure in the State' must have been referring to the Massachusetts law," and "strongly indicates that preemption was not intended." Marconis, 942 F.2d at 851.
 
 
 44
 We hold that the appellants have failed to show that Congress has expressed a clear and manifest intent to occupy the field of balance billing. Accordingly, we conclude that the district court did not err in rejecting the argument that the Medicare Act preempted the field.
 
 B. Conflict Preemption
 
 45
 Appellants also contend that Chapter 572 impermissibly conflicts with the Medicare Act. As relevant here, conflict preemption requires a state law to be struck down if it "stands 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 281, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987) (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).
 
 
 46
 The appellants argue that Chapter 572 "stands as an obstacle" to the Medicare Act because it: (1) obstructs the purposes of the Act "by upsetting the careful balance of interests established by Congress," and (2) "interferes with the methods chosen by Congress for achieving its objectives," by establishing Medicare reimbursement policy at the state level.
 
 1. The Obstruction Argument
 
 47
 Appellants state that the overriding purpose of Congress in its regulation of balance billing was to strike a careful balance among competing policy and logistical objectives. They argue that balance billing represents Congress's attempt to create a safety valve, so that those who can afford premium health care may get it without forfeiting their right to Medicare benefits. Because Chapter 572 restricts balance billing, the appellants contend that it obstructs the delicately crafted federal regime, and, is therefore preempted.
 
 
 48
 The district court conceded that balance billing operates as a safety valve, but rejected the notion that Congress intended to impose the valve on every state. It pointed out that "Congress left room for the states to regulate physician costs," and stated that it could find "no evidence that the design of Congress encompassed national uniformity." 777 F.Supp. at 1164. Accordingly, the court held that "[t]here is no reason to ascribe to Congress the desire to disturb New York's fee structure." Id. We agree.
 
 
 49
 In reaching this conclusion, we note that Congress has clearly recognized state sovereignty on certain health issues, including "the manner in which medical services are provided," "the compensation" of any provider, and "the administration or operation" of any health care provider, and has also proclaimed that in these areas it does not purport either to control or supervise. 42 U.S.C. § 1395. The appellants have failed to demonstrate that Congress, by imposing a ceiling on overcharge percentage rates for physicians who balance bill, intended to block states from establishing an even lower ceiling. Indeed, the First and Third Circuits upheld state statutes totally abolishing balance billing, see Massachusetts Medical Soc'y, 815 F.2d at 790-91; Marconis, 942 F.2d at 845. Chapter 572, by comparison, merely lowers the levels at which physicians may balance bill. We therefore reject their assertion that Chapter 572 is preempted because it obstructs the Medicare Act.
 
 2. The Interference Argument
 
 50
 The appellants' final contention is that Chapter 572 interferes with Congress's method to achieve its regulatory objectives. They assert that because Chapter 572 creates a system of joint state-federal decision-making as to physician charges it impermissibly interferes with Congress's exclusive control over the Medicare Act. To support this argument, the appellants cite Ray v. Atlantic Richfield Co., 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978), where the Supreme Court stated that when Congress decides that its regulatory interests are better served by having "a single [federal] decision maker, rather than a different one in each State," the states are not free to decide otherwise. Id. at 177, 98 S.Ct. at 1004.
 
 
 51
 This argument founders upon the same rocks that doomed the appellants' other preemption claims: the appellants cannot show a clear and manifest congressional intent to preempt. Their claim that Congress wanted the federal government to possess a monopoly over all decisions about the fees a physician may charge to Medicare beneficiaries is belied by the same evidence that defeats their other preemption challenges. Additionally, appellants concede that, under certain circumstances, local carriers may determine whether a regional variation is necessary. This concession that a non-federal actor may make decisions directly affecting reimbursement policy, defeats their claim that Medicare is a program "of exclusively federal nature," and renders inapposite the Ray case, which addressed only those situations where a "single decision maker" is envisioned. 435 U.S. at 177, 98 S.Ct. at 1004 (emphasis added). Because appellants have failed to show that Chapter 572 impermissibly interferes with Congress's methods for achieving the regulatory objectives of the Medicare Act, we reject their preemption claim on this ground.
 
 CONCLUSION
 
 52
 Because Congress has not clearly and manifestly expressed its intent that such a statute be preempted, we conclude that Chapter 572 is not preempted by the Medicare Act. Therefore, the district court's order granting summary judgment for the appellees and denying summary judgment for the appellants is affirmed.
 
 
 
 *
 After argument but before decision, Chief Judge Oakes became a Senior Circuit Judge
 
 
 **
 Honorable Donald P. Lay of the United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 They also challenged Chapter 572 on the ground that it violates the Due Process clause of the Fourteenth Amendment. The district court rejected this argument and the appellants have not renewed it here
 
 
 [2]
 For services rendered before January 1, 1992, the reasonable charge is generally the lowest of the following: (1) the actual charge by the physician; (2) the physician's customary charge for the particular service rendered; or (3) the prevailing charge by local physicians for similar services. See Cosgrove v. Bowen, 898 F.2d 332, 333 (2d Cir.1990); 42 U.S.C. § 1395u(b); 42 C.F.R. §§ 405.503-04 (1991). For a service provided after January 1, 1992, the reasonable charge is the lesser of an amount set forth in a uniform fee schedule reflecting an objective evaluation of the physician resources required to provide a particular service or the amount that the physician actually charged. 42 U.S.C. § 1395w-4(a)(1). On the very day this appeal was argued, a New York court held that Chapter 572 does not apply to services rendered after January 1, 1992. Medical Soc'y of the State of New York v. New York Dep't of Health, No. 2538-92 (Sup.Ct. Albany Co.) (June 5, 1992). An appeal from that judgment was filed on July 9, 1992, automatically staying its enforcement. N.Y.Civ.Prac.L. & R. § 5519(a) (McKinney 1978). We need not consider what effect, if any, that decision would have on our analysis
 
 
 [3]
 § 1395w-4(g)(2)(D) defines "recognized payment amount" for services rendered in 1991 as "the prevailing charge (or fee schedule amount) for non-participating physicians for that year." For services rendered after 1991, it is "the fee schedule amount determined under subsection (a) of this section." Id