The TRAVELERS INSURANCE COMPANY, Plaintiff,

New York State Health Maintenance Organization Conference, Intervenor,

v.

Mario M. CUOMO, in his Official Capacity as Governor of the State of New York, et al., Defendants,

New York State Conference of Blue Cross and Blue Shield Plans, Empire Blue Cross and Blue Shield, and Hospital Association of New York State, Intervenors.

The HEALTH INSURANCE ASSOCIATION OF AMERICA, et al., Plaintiffs,

New York State Health Maintenance Organization Conference, Intervenor,

v.

Mark CHASSIN, M.D., in his Official Capacity as Commissioner of Health of the State of New York, et al., Defendants,

New York State Conference of Blue Cross and Blue Shield Plans, Empire Blue Cross and Blue Shield, and Hospital Association of New York State, Intervenors.

Nos. 92 Civ. 3999 (LJF), 92 Civ. 5419 (LJF).

United States District Court, S.D. New York.

Feb. 3, 1993.

Order Granting Stay in Part Feb. 9, 1993.

Craig Murphy, Windels, Marx, Davies & Ives, New York City, for plaintiff, Travelers Ins. Co.

Clifford Stromberg, Hogan & Hartson, Washington, DC, for plaintiffs, Aetna Life Ins. and Mut. of Omaha.

Sidney S. Rosdeitcher and Catherine J. Ross, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff, Health Ins. Assoc. of America.

Jane Lauer Barker, Office of the Atty. Gen., State of N.Y., New York City, for defendants.

Harold N. Iselin, Couch, White, Brenner, Howard & Feigenbaum, Albany, NY, for intervenors, NYS Health Maintenance Organization.

B.J. Costello, Hinman, Straub, Pigors & Manning, P.C., Albany, NY, for intervenor, NYS Conference of Blue Cross Blue Shield Plans.

Robert A. Bicks, Breed, Abbott & Morgan, New York City, for intervenor, Empire Blue Cross Blue Shield.

Philip Rosenberg, Sherrin & Glasel, Albany, NY, for intervenor, NYS Hosp. Assn.

## OPINION AND ORDER

FREEH, District Judge.

These consolidated actions involve a challenge by plaintiffs The Travelers Insurance Company ("Travelers") and The Health Insurance Association of America ("HIAA"), among others, to a number of New York statutes imposing surcharges on the hospital rates for certain categories of payors (the "Surcharges"). Travelers also challenges a Department of Insurance letter interpreting some of those provisions (the "Actuarial Letter").

In their complaints, plaintiffs claim that the Surcharges and Actuarial Letter are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA") and the Federal Employees Health Benefits Act ("FEHBA"). Plaintiffs now move for summary judgment. The New York State Health Maintenance Organization Conference (the "HMOs") has intervened and filed briefs in support of that motion. The United States has also filed an *amicus curiae* brief in support of plaintiffs' FEHBA claims.

Defendants oppose plaintiffs' motion and cross-move for summary judgment on all of plaintiffs' claims. The New York State Conference of Blue Cross and Blue Shield Plans, Empire Blue Cross and Blue Shield (collectively, the "Blues") and the Hospital Association of New York State ("HANYS") have intervened and filed briefs in support of defendants' position.

For the reasons stated below, plaintiffs' motion for summary judgment is granted in part and denied in part. Defendants' cross-motion is denied. In sum, the Court finds that (1) the Tax Injunction Act does not preclude an injunction against the 9% and 11% Surcharges; (2) the three statutory provisions at issue are all preempted by ERISA; (3) plaintiffs' claims as to the 13% Surcharge are not barred by the doctrine of laches; (4) both the 11% and 13% Surcharges are preempted by FEHBA; and (5) Items 1, 2, 3 and 5 of the Actuarial Letter are also preempted by ERISA.

## BACKGROUND

As stated in the Court's prior orders dated November 10 and December 17, 1992, this case involves New York's comprehensive statutory scheme for the regulation of in-patient hospital rates. As a general rule, a patient's hospital rate is determined by the patient's diagnosis, which governs the particular category, or Diagnosis Related Group ("DRG"), to which the case is assigned. The hospital charges patients the rate applicable to their assigned DRG, subject to certain adjustments reflecting costs specific to that hospital.

Section 2807-c(1)(b) of New York's Public Health Law provides that the DRG rate for inpatient services is increased by 13% for all patients covered by any form of health insurance other than Blue Cross and Blue Shield, a health maintenance organization ("HMO") or a government plan such as Medicare (the "13% Surcharge"). Thus, patients who have hospital coverage through commercial insurers or self-insured employee benefit plans pay 113% of the applicable DRG rate, while patients who have hospital coverage through the Blues, an HMO or a government plan pay the basic DRG rate. The 13% surcharge is paid directly to the hospital.

On April 2, 1992, the New York State Legislature adopted the Omnibus Revenue Act of 1992 (the "1992 Act"), which amends the Public Health Law to impose an additional 11% surcharge on rates charged to

patients insured by commercial insurers (the "11% Surcharge"). The proceeds of the 11% Surcharge are initially paid by commercial insurers to the hospital, but the hospital must then submit the funds to a pool established by the Commissioner of Health. The 11% Surcharge is then deposited into the State's General Fund.

In addition to the 11% Surcharge, the 1992 Act imposes a surcharge of up to 9% on the hospitalization cost of patients covered by HMOs (the "9% Surcharge"). While HMOs may reduce the 9% Surcharge by enrolling a specified number of Medicaid patients, HMOs which do not or cannot meet the statutory requirements must pay the full amount. Unlike the 11% Surcharge, the 9% Surcharge is not paid to the state through the hospital. Rather, each HMO must pay the surcharge funds directly into a statewide pool established by the Commissioner for Social Services. Like the 11% Surcharge, however, the 9% Surcharge is ultimately deposited into the State's General Fund.

Plaintiffs filed this action, claiming that the statutory surcharges and the Actuarial Letter are preempted under ERISA and FEHBA. Defendants disagree, and argue that the statutes at issue constitute a legitimate exercise of the State's power to regulate hospital rates and/or insurance.

## DISCUSSION

### 1. The Tax Injunction Act

As an initial matter, the Court must determine whether the Tax Injunction Act (the "TIA"), 28 U.S.C. § 1341, bars plaintiffs' claims as to the 9% and 11% Surcharges. The TIA provides that:

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such state.

Thus, to determine whether a particular action falls within the scope of the TIA, a federal district court must determine (1) whether the charge at issue is a "tax," and (2) whether the State provides a "plain, speedy and efficient remedy."

The State, presumably the party with the greatest interest in such matters, has not relied upon the TIA in their papers before this Court. The Blues argue, however, that the TIA applies here because the 9% and 11% Surcharges constitute a state tax which could be challenged in New York state court.

■ The Court disagrees. Even assuming that the Surcharges are "taxes" within the meaning of the TIA,[1] an action to enjoin such taxes as violations of ERISA falls within a judicially-created exception to the TIA. *See National Carriers' Conference Committee v. Heffernan*, 440 F.Supp. 1280 (D.Ct.1977).

In *Heffernan*, then District Judge Newman denied a motion to dismiss an ERISA plan's challenge to a Connecticut state tax on benefits paid out under the plan. 440 F.Supp. at 1281. In making that ruling, Judge Newman specifically found that because the United States could have brought the action at issue and because "[t]he very terms of ERISA indicate that Congress intended private plaintiffs' access to the federal courts to be no less than that of the Secretary of Labor's," the plaintiff came within the "federal instrumentalities" exception to the TIA. *Id.* at 1284.

---

1. As discussed more fully below, the State's purpose in enacting the 9% and 11% Surcharges is not entirely clear. That purpose is central, however, to a determination whether the Surcharges constitute "taxes" within the meaning of the TIA. As other courts have noted, "[i]n general, 'assessments imposed primarily for revenue-raising purposes are 'taxes,' while those levies assessed for regulatory or punitive purposes, even though they may also raise revenues are generally not 'taxes.'" *United Wire, Metal & Machine Health and Welfare Fund v. Morris-* town Memorial Hospital, 793 F.Supp. 524, 530 (D.N.J.1992) (*quoting Butler v. Maine Supreme Judicial Court*, 767 F.Supp. 17, 18 (D.Me.1991)). However, to the extent that the 9% and 11% Surcharges are paid into New York's General Fund, they appear to be taxes. *Compare United Wire*, 793 F.Supp. at 531 (finding that revenues generated by New Jersey hospital rate-setting statute do not constitute taxes because not "intermingled in a general fund" or used "for the general welfare").

The same holds true in this case. There can be no doubt that the Secretary of Labor could have filed an action to enjoin the Surcharges at issue. *See* 29 U.S.C. § 1132(a)(5) (Secretary may sue "to enjoin any act or practice which violates" ERISA, or "to obtain other appropriate equitable relief"); *Heffernan*, 440 F.Supp. at 1284 (discussing federal government's interest in ERISA plans). As a result, private parties such as plaintiffs are also entitled to do so.[2]

In any event, the Court finds that these plaintiffs do not have a "plain, speedy and efficient" remedy in New York state court. Because ERISA generally confers exclusive jurisdiction on the federal courts, a New York state court "might well feel compelled to dismiss [a state court action] on the grounds that its jurisdiction has been preempted ... [Thus,] [a]t a minimum the availability of a state court remedy is not 'plain.'" *Heffernan*, 440 F.Supp. at 1283.

It is also unclear whether plaintiffs have any remedy in state court at all. Plaintiffs are suing here in their capacity as fiduciaries for ERISA plans. However, the New York statute is structured so that ERISA plans do not themselves pay the Surcharges. As a result, plaintiffs are not "taxpayers," and could not file a declaratory judgment action in state court to enjoin enforcement of the taxes at issue. (Blues' Brief at 43). *Compare Morgan Guaranty Trust Company of New York v. Tax Appeals Tribunal*, 80 N.Y.2d 44, 587 N.Y.S.2d 252, 599 N.E.2d 656 (1992) (ERISA plan itself paid challenged tax on capital gains from real estate transfer).

Plaintiffs are also precluded from seeking reimbursement in the New York Court of Claims. Again, although plaintiffs could sue on their own behalf to recover monies improperly paid to the State, plaintiffs could not sue on behalf of ERISA plans, because those plans do not pay the Surcharges. Accordingly, the parties on whose behalf plaintiffs are acting—the plans themselves—have no plain and efficient remedy in New York state courts.

### 2. ERISA Preemption

#### a. General Principles of Preemption

In determining whether a federal statute preempts a state law, Congress' intent controls. *FMC Corp. v. Holliday*, 498 U.S. 52, 56, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990). "If the intent of Congress is clear, that is the end of the matter; for the court ... must give effect to the unambiguously express intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). *See also Cipollone v. Liggett Group, Inc.*, — U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (congressional intent "'is the ultimate touchstone' of preemption analysis") (*quoting Malone v. White Motor Corp.*, 435 U.S. 497, 502–04, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978)). At the same time, a court must presume that Congress did not intend to preempt "areas of traditional state regulation." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 740, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985).

ERISA's preemption clause is notably broad. *See* 29 U.S.C. § 1144(a); *FMC*

**2.** The Supreme Court has declined to decide whether ERISA either creates or falls within an already existing exception to the TIA. *See Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 20–22 and n. 21, 103 S.Ct. 2841, 2852 and n. 21, 77 L.Ed.2d 420 (1983). The Ninth Circuit has held that no such exception exists, although the Court did not discuss the federal instrumentality exception relied upon in *Heffernan*. *See Ashton v. Cory*, 780 F.2d 816, 821–22 (9th Cir.1986) ("Nothing in the legislative history of ERISA suggests that in enacting federal law ... provid[e] for exclusive federal jurisdiction over certain civil enforcement proceedings under ERISA, Congress sought to override the historic concern for state fiscal autonomy that underlies the [TIA]."). *See also Retirement Fund Trust v. Franchise Tax Board*, 909 F.2d 1266, 1272 (9th Cir.1990); *General Motors Corp. v. California Board of Equalization*, 815 F.2d 1305, 1308 (9th Cir.1987), *cert. denied*, 485 U.S. 941, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988). However, other courts have disagreed with the Ninth Circuit. *See, e.g., E-Systems, Inc. v. Pogue*, 929 F.2d 1100, 1102 (5th Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 585, 116 L.Ed.2d 610 (1991).

*Corp.,* 498 U.S. at 56, 111 S.Ct. at 407 ("The [ERISA] pre-emption clause is conspicuous for its breadth."). That provision states that, except as provided in the savings clause, "the provisions of this subchapter ... shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ..."

■ The Supreme Court has held that a law "relates to" an employee benefit plan "in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990). *See also Shaw v. Delta Air Lines Inc.,* 463 U.S. 85, 96–98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). Thus, preemption is not precluded merely because a law is not specifically designed to affect employee benefit plans, or because it does not deal exclusively with subjects covered by ERISA. *FMC Corp.,* 498 U.S. at 58, 111 S.Ct. at 408. To the contrary, a state law may be preempted even if it is consistent with ERISA's substantive requirements. *Metropolitan Life,* 471 U.S. at 739–41, 105 S.Ct. at 2389. Moreover, as the Second Circuit recently noted, even "a state law of general application, with only an indirect effect on a pension plan, may nevertheless be considered to 'relate to' that plan for preemption purposes." *Smith v. Dunham–Bush, Inc.,* 959 F.2d 6, 9 (2d Cir.1992); *Ingersoll–Rand,* 498 U.S. at 139, 111 S.Ct. at 483 (state law may relate to a benefit plan and be preempted even if effect on that plan is only indirect).[3]

As other courts have noted, the legislative history of ERISA also supports a broad reading of the preemption clause. *See McCoy v. Massachusetts Institute of Technology,* 950 F.2d 13, 17 (1st Cir.1991) (legislative history "counsels against a crabbed interpretation of the statute"), *cert. denied,* —— U.S. ——, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992). The bill that became the ERISA statute originally contained a much narrower preemption provision. *Shaw,* 463 U.S. at 98–100, 103 S.Ct. at 2901. However, the Conference Committee rejected that more restrictive language, and substituted the current provision. *Id.* 463 U.S. at 96–98, 103 S.Ct. at 2900.

Although expansive, ERISA's preemption clause does have certain well-established limits. For example, the Supreme Court has expressly acknowledged that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21. *See, e.g., Mackey v. Lanier Collections Agency & Service, Inc.,* 486 U.S. 825, 830–41, 108 S.Ct. 2182, 2186–91, 100 L.Ed.2d 836 (1988) (generally applicable garnishment law not preempted); *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 6–8, 107 S.Ct. 2211, 2215, 96 L.Ed.2d 1 (1987) (one-time severance payment not preempted).

In addition, ERISA itself contains a "savings clause" which states that "[e]xcept as provided ... nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A). Thus, to the extent that the New York laws at issue here have only a peripheral impact on ERISA plans, or regulate insurance within the meaning of the savings clause, those laws will not be preempted.[4]

---

**3.** *See also District of Columbia v. Washington Trade Bd.,* —— U.S. ——, ——, 113 S.Ct. 580, 583, 121 L.Ed.2d 513 (1992) (Supreme Court's interpretation of phrase "relate to" is "true to the ordinary meaning" of the term, and "gives effect to the 'deliberately expansive' language chosen by Congress"); *Alessi v. Raybestos–Manhattan Inc.,* 451 U.S. 504, 525, 101 S.Ct. 1895, 1907, 68 L.Ed.2d 402 (1981) ("It is of no moment that New Jersey intrudes indirectly through a work-ers' compensation law, rather than directly, through a statute called 'pension regulation.' ").

**4.** As discussed more fully below, ERISA also contains a "deemer" clause, which limits the scope of the savings clause, and provides that "[n]either an employee benefit plan ... nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer ... to be engaged in the business of insurance ... for purposes of any law of any

## b. "Relates To"

 Although the 9%, 11% and 13% Surcharges do not expressly refer to ERISA plans, it is clear that those statutes have a "connection with" such plans. *See United Wire,* 793 F.Supp. at 535 ("The fact that these provisions do not mention benefit plans directly and do not regulate the terms and conditions of such plans explicitly, has no bearing on this Court's findings."). Accordingly, the Court finds that the Surcharges are preempted by ERISA unless they fall with the scope of the savings clause.

The parties dispute the exact impact of the Surcharges on ERISA plans. (*See* Defendants' Brief at 15–21) (discussing "tenuous and remote" economic effect of statute). Under the statutes' current framework, the Surcharges do not directly increase a plan's costs or effect the level of benefits to be offered. However, there can

be little doubt that the Surcharges at issue will have a significant effect on the commercial insurers and HMOs which do or could provide coverage for ERISA plans [5] and thus lead, at least indirectly, to an increase in plan costs. Plaintiffs have submitted affidavits stating that if the Surcharges are enforced against them, they will pass along those increased costs [6] to their customers, including employee benefit plans.[7]

More importantly, defendants' entire justification for the Surcharges is premised on that exact result—that the Surcharges will increase the cost of obtaining medical insurance through any source other than the Blues to a sufficient extent that customers will switch their coverage to and ensure the economic viability of the Blues.[8] (*See, e.g.,* Defendants' Brief at 34) ("An increase in the [13%] differential was considered necessary to prevent the continuing shrinkage of the Blue Cross community pools.");

---

State purporting to regulate insurance companies [or] insurance contracts ..." 29 U.S.C. § 1144(b)(2)(B).

5. Defendants do not dispute that commercial insurers provide benefits to a substantial number of employee benefits plans in New York. (*See* Musco Aff. ¶ 9; Donnelly Aff. ¶ 4) (in New York, as elsewhere, "vast majority" of purchasers of commercial insurance are covered pursuant to ERISA plan); (Welch Aff. ¶ 7; Burke Aff. ¶ 2) (describing plans covered by Aetna). Defendants also do not dispute that under New York law, employee benefit plans are required by statute to offer HMO coverage to their members. *See* Public Health Law § 4407.

6. (*See, e.g.,* Allen Aff. ¶ 22) (9% Surcharge translates into an immediate 2.5%–3.5% increase in HMO costs); (Welch Aff. ¶ 11–12) (13% Surcharge increases costs for both self-insured and insured plans).

 Defendants dispute plaintiffs' characterization of the 13% Surcharge as an "increase" in the commercial insurers' costs, given that the 13% differential was initially imposed to reduce the then-existing disparity between hospital rates for commercial insurers and the Blues. (*See, e.g.,* Rosenberg Reply Aff. ¶ 6). The parties also disagree as to whether the commercial insurers originally supported or opposed the 13% Surcharge. Without resolving these disputes, the Court finds that, to the extent the 13% Surcharge does impose higher hospital rates for patients covered by commercial insurers than those covered by the Blues (1) that Surcharge statutorily mandates increased costs for the commercial insurers; and (2) the commercial

insurers pass those increased costs on to their customers. (Sujecki Aff. ¶ 4–6). Whether a "differential" would naturally exist between commercial insurers and the Blues in the absence of state regulation is irrelevant to an analysis whether, under ERISA, a state may impose such a differential.

7. (*See* Allen Aff. ¶ 27) (by April 1993, "many" HMO subscribers will pay an additional 2.5%–3.5%); (D'Ascoli Aff. ¶ 7) (surcharge will "significantly increase" amount Aetna HMO must charge participants); (Welch Aff. ¶ 12–13) (under Aetna's agreements with ERISA plans, surcharges "also increase the amounts that sponsors of plans ... must pay for that coverage"); (Burke Aff. ¶ 7) (increase in costs of health care have "substantial effect" on premiums charged); (Gutterman Aff. ¶ 9 and Sujecki Aff. ¶ 2–3) (Travelers has and will continue to pass its increased costs along to customers in form of increased premiums).

 In fact, a number of HMO's have already applied to the State Insurance Department for rate increases, based, at least in part, on the 9% surcharge. (*See* Rachlin Aff. and exhibits thereto). At least two of those applications have been granted. (*Id.* Exs. A and B).

8. This justification is, itself, open to question. At least as to the 9% and 11% Surcharges, it appears that a major purpose of the legislation was to balance the State's budget. (*See* Petersen Aff. ¶ 4–7; Weissman Reply Aff. ¶ 26). (*See also* Anderman Aff. ¶ 25) (11% Surcharge paid directly to State "[b]ecause of State's own pressing fiscal needs).

(Weissman Reply Aff. ¶ 8) (surcharges permit the Blues "to remain competitive").[9] Thus, even if the exact economic effect of the Surcharges cannot be determined at this stage in the litigation, the Court finds that that effect is intended to be and is in fact substantial.

Defendants argue that because the Surcharges do not impact the structure or administration of employee benefit plans, impose requirements on use of plan resources, or impose inconsistent obligations upon multi-state plans, those statutes do not "relate to" the plans for preemption purposes. (Defendants' Brief at 21–28). As indicated above, the Supreme Court does not condition a finding of ERISA preemption upon a showing of any of the three factors relied upon by the State. Rather, the Supreme Court has found that ERISA's preemption clause should be "given its broad common-sense meaning." *Metropolitan Life*, 471 U.S. at 739, 105 S.Ct. at 2389. While the factors relied upon by defendants may be relevant to the preemption inquiry, they are not dispositive.[10]

Even under defendants' analysis, however, the Surcharges have a sufficient impact on ERISA plans to be preempted. To the extent that the Surcharges impose a substantial economic burden on the commercial insurers and HMOs which provide services to employee benefit plans, those Surcharges may effect the structure and/or administration of such plans. *Compare United Wire,* 793 F.Supp. at 536 (New Jersey hospital rate-setting statute, which provides certain payors with discounts from the usually-applicable DRG rate, "affect[s] the structure of the [plans] themselves"). The Court has already found that commercial insurers and HMOs pass at least a portion of their increased costs on to the plans. In response to those increases, the plans may reduce the level of benefits or services offered rather than increase costs to participants—a burden on plan administration which ERISA was designed to avoid. *See E–Systems*, 929 F.2d at 1103 (Texas statute preempted because "[t]he cost of the plan must ... increase ... or the benefits must be adjusted downwards to offset the tax bite[,] ... [precisely] the type of impact Congress intended to avoid when it enacted the ERISA legislation"); *General Electric v. Department of Labor*, 891 F.2d 25, 29 (2d Cir.1989) (statute has "connection with" ERISA plan if it "prescribes either the type and amount of an employer's contributions to a plan, the rules and regulations under which the plan operates, or the nature and amount of the benefits provided thereunder") (citations omitted), *cert. denied*, 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990).

Similarly, even an indirect increase in plan costs imposes "requirements" on use of plan resources. In fact, it diverts a not-insignificant amount of those resources to a State-specified use which is unrelated to the health care of plan participants. *See United Wire*, 793 F.Supp. at 535 (discounts to certain payors of hospital bills "force [ERISA plans] to incur costs for the benefit of others ...").

Finally, as discussed more fully below, if plans do opt to change the level of benefits offered rather than pass their increased costs on to participants, the Surcharges will, at least indirectly, impose inconsistent obligations upon multi-state plans—exactly the type of burden ERISA's preemption

---

**9.** (*See also* Weissman Reply Aff. ¶¶ 11–14) (Gallup poll indicates that majority of small groups cancelling with Empire Blue Cross and Blue Shield did so because of cost differential between Empire and commercial insurers); (Clyne Aff. ¶ 18–19) (discussing importance of maintaining community-rated pools of insurance).

**10.** *See also Firestone Tire & Rubber Co. v. Neusser*, 810 F.2d 550, 555–56 (6th Cir.1987) (in determining whether statute's impact on ERISA plan is too remote or peripheral, three factors should be considered: whether state law repre-

sents traditional exercise of state authority, whether the law effects the relation between "principal ERISA entities—the employer, the plan fiduciaries, and the beneficiaries, and whether the impact of the statute on an ERISA plan is merely "incidental"); *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146 (2d Cir.1989) (ERISA preemption triggered "not just [by] any indirect effect on administrative procedures but rather an effect on the primary administrative functions of benefit plans ..."), *cert. denied*, 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989).

clause was intended to prevent. *See United Wire*, 793 F.Supp. at 535 and n. 15 (New Jersey statute may subject plans to inconsistent regulations given that other states may not include similar costs in their hospital rates). *See also Ingersoll*, 498 U.S. at 141, 111 S.Ct. at 484 (state laws which impose different substantive standards require "the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction ... [and are] fundamentally at odds with the goal of uniformity that Congress sought to implement").

c. Rebaldo v. Cuomo

Defendants argue that the Surcharges do not "relate to" ERISA plans within the meaning of ERISA's preemption clause because they are laws of general application, which have only a peripheral impact on the plans. (Defendants' Brief at 13; HANYS' Brief at 13–14; Blues' Brief at 14). In making this argument, defendants rely on *Rebaldo v. Cuomo*, 749 F.2d 133 (2d Cir. 1984), *cert. denied*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985), a case in which the Second Circuit ruled that New York's prior hospital rate-setting statute, which granted patients covered by Blue Cross a 12–15% discount from the DRG rate, was not preempted by ERISA. 749 F.2d at 139 ("Where, as here, a State statute of general application does not affect the structure, the administration, or the type of benefits provided by an ERISA plan, the mere fact that the statute has some economic impact on the plan does not require that the statute be invalidated."). However, because the Court finds that *Rebaldo* has been abrogated by later Supreme Court cases, that case is not controlling here.

In *Rebaldo*, the Second Circuit held that "a state law must 'purport[ ] to regulate, ... the terms and conditions of employee benefit plans' to fall within the preemption provision." 749 F.2d at 137. As the Sec-

ond Circuit has itself recognized, the Supreme Court has "expressly rejected" that limitation on ERISA preemption.[11] *See Smith*, 959 F.2d at 9 n. 3 (*citing Ingersoll–Rand*, 498 U.S. at 141, 111 S.Ct. at 484).

Despite this, defendants argue that the remainder of the case is still good law. The Court disagrees. In *Rebaldo*, the Second Circuit's "purport to regulate" language appears in the very beginning of the Court's discussion of ERISA preemption. 749 F.2d at 137. Therefore, as this Court reads the case, that initial finding colored the rest of the Court's analysis of ERISA, and contributed significantly to its holding.

Even putting aside *Rebaldo*'s "purport to regulate" language, it seems clear that a number of the factors relied upon by the Second Circuit to uphold New York's prior hospital rate-setting statute have now been rejected by the Supreme Court. For example, the Court stated that the "mere fact" that a state statute has "some economic impact" on an ERISA plan does not require that the statute be invalidated. 749 F.2d at 139. That may be true if the economic impact is only incidental. *See Shaw*, 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21. However, to the extent that the Supreme Court has expressly recognized that even an indirect impact on an ERISA plan may require a finding of preemption, economic impact alone may be enough to invalidate a particular statute.

In asserting the contrary rule, defendants and intervenors rely heavily on *Rebaldo*'s discussion of the economic impact of hospital rates on ERISA plans:

The purchase of hospital service is like the purchase of public utility service, or of any other service or commodity whose price is controlled by the State. Insofar as the regulation of hospital rates affects a plan's cost of doing business, it also may be analogized to State labor laws

---

**11.** The fact that the Second Circuit recently cited *Rebaldo* does not undermine the Court's own recognition that the case is of questionable validity for these purposes. The issue in *Medical Society of the State of New York v. Cuomo*, 976 F.2d 812 (2d Cir.1992), was preemption under the Health Insurance for the Aged Act or Medicare Act, not ERISA. While the Second Circuit did cite *Rebaldo* for the proposition that "regulation of public health and the cost of medical care" are traditionally matters for the state, 976 F.2d at 816, the Court distinguished *Rebaldo* from the *Medical Society* case on the grounds that *Rebaldo* (and ERISA) involved an express preemption clause, which the Medicare Act did not. *Id.* at 817.

that govern working conditions and labor costs, to rent control laws that determine what employee benefit plans pay or receive for rental property, and even to such minor costs as the Thruway, bridge and tunnel tolls that are charged to plans' officers or employees. In short, if ERISA is held to invalidate every State action that may increase the cost of operating employee benefit plans, those plans will be permitted a charmed existence that never was contemplated by Congress. [749 F.2d at 138–39].

In making this statement, the Second Circuit appears to have assumed that the economic impact of the hospital rate-setting statute on ERISA plans was both insubstantial and indirect. It is true that certain statutes might have such an insignificant economic impact on employee benefit plans that they could be compared to rent control laws. However, as discussed above, statutes like those at issue in this case—which are expressly directed at the cost of medical care—are likely to have a substantial, although indirect, impact on either a plan's costs or benefits, an impact which falls within the preempted sphere of ERISA.

The *Rebaldo* court also stated that "[t]here is no valid reason why employee benefit plans cannot be subject to nationally uniform supervision despite dissimilarities in their costs of doing business." 749 F.2d at 139. But if, as here, the dissimilarities in cost are substantial, they would "require plan providers to calculate benefit levels in [New York] based on expected liability conditions that differ from those in States that [do not impose such costs]." [12] *FMC Corp.*, 498 U.S. at 58, 111 S.Ct. at 408. Therefore, to the extent that the increased costs affect plans' decisions regarding level of benefits, those costs "would ... frustrate plan administrators' continuing obligation to calculate uniform

benefit levels nationwide." *Id.* 498 U.S. at 60, 111 S.Ct. at 409.

Defendants correctly note that, to the extent that the Court finds that New York's statutes "relate to" employee benefits plans, then "ERISA preempts all state hospital rate-setting statutes, at least to the extent they apply to rates charged to patients that are participants in ERISA plans which include hospital expenses as a benefit." (Defendants' Brief at 25 n. 19). This result is obviously undesirable in that it greatly complicates states' efforts to regulate and control hospital costs. But given the breadth of ERISA's preemption clause and the Supreme Court's recent interpretations of that provision, such a consequence may necessarily occur. As the Supreme Court has itself noted, "[a]rguments as to the wisdom" of such a broad preemption rule "must be directed at Congress," not the courts. *Metropolitan Life*, 471 U.S. at 747, 105 S.Ct. at 2393.

### d. The Savings Clause

Having found that the Surcharges all have a substantial economic impact on and thus connection with ERISA plans, the Court must now determine whether those surcharges fall within the scope of ERISA's "savings clause," which provides that "[e]xcept as provided ... nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A).

In determining whether a particular state law is saved from preemption under this clause, a court must first determine whether the law "regulates insurance," that is, whether the law not only has an impact on the insurance industry, but is "specifically directed toward that industry." *Pilot Life Insurance Company v.*

---

**12.** Defendants appear to concede this point, by arguing that even if commercial insurers do experience increased costs as a result of the statutory surcharges, they can avoid passing those costs along to ERISA plans by reducing the level of benefits offered. (Defendants' Brief at 19 and n. 15). However, an indirect requirement that a plan reduce its benefits in a single state, based on that state's distinctive law, is

exactly the type of conflicting obligation that ERISA's preemption clause was designed to avoid. *See FMC*, 498 U.S. at 58, 111 S.Ct. at 408 ("To require plan providers to design their programs in an environment of differing State regulations would complicate the administration of nationwide plans, producing inefficiencies that employers might offset with decreased benefits.").

*Dedeaux,* 481 U.S. 41, 50, 107 S.Ct. 1549, 1554, 95 L.Ed.2d 39 (1987); *Howard v. Gleason Corp.,* 901 F.2d 1154, 1158 (2d Cir.1990). A court must also consider whether the law satisfies the three criteria for determining whether a practice constitutes "the business of insurance" under the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq. Pilot Life,* 481 U.S. at 48–49, 107 S.Ct. at 1553. Those criteria are:

> *First,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.

*Id. (quoting Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982)) (emphasis in original).[13]

### (i) *Regulating Insurance*

Applying these factors to the Surcharges, it is clear that none of them qualify as laws "regulating insurance" within the meaning of the savings clause. As an initial matter, the Court finds that both the 9% Surcharge and those portions of the 13% Surcharge referring to self-insured plans could not possibly fall within the scope of the savings clause because HMOs and self-insured plans do not engage in the "business of insurance" as a matter of law. *See FMC Corp.,* 498 U.S. at 60, 111 S.Ct. at 409 (holding that self-funded ERISA plans

"are exempt from state regulation insofar as that regulation 'relate[s] to' the plans"); *O'Reilly v. Ceuleers,* 912 F.2d 1383, 1389 (11th Cir.1990) (health maintenance organization does not engage in the business of insurance for purposes of ERISA); *McManus v. Travelers Health Network of Texas,* 742 F.Supp. 377, 382 n. 5 (W.D.Texas 1990) (because Texas "HMO Act" is not "specifically directed" at the insurance industry, it does not fall within scope of ERISA savings clause).[14]

It is also clear that the 11% Surcharge and the remaining portions of the 13% Surcharge are not "specifically directed" at the insurance industry. To the contrary, as defendants themselves appear to concede, the Surcharges' primary goal is to regulate hospital rates, not commercial insurers. (*See* Defendants' Brief at 10, 13) (referring to law at issue as "New York's hospital rate-setting statute," and specifically stating that the law "regulates hospitals"); (Anderman Aff. ¶ 29) (noting that "differentials" are "simply part of a matrix of statutorily mandated State controls imposed on hospitals in New York").

### (ii) *McCarran–Ferguson Criteria*

Given these findings, the Court must next consider whether the Surcharges satisfy any of the McCarran–Ferguson criteria. With regard to the "spreading of the risk" factor, the Court finds that the 11% and 13% Surcharges do, at least minimally, spread the risk of insuring high risk indi-

---

**13.** In *Pilot Life,* the Supreme Court also evaluated the law at issue—common law tort and contract claims for improper processing of benefits—in light of the role of the savings clause in ERISA as a whole. Such an analysis was considered necessary because ERISA itself contained provisions addressing the identical subject. 481 U.S. at 51–52, 107 S.Ct. at 1555. By contrast, the Surcharges do not implicate substantive ERISA provisions. Accordingly, this last aspect of the *Pilot Life* case does not apply here.

**14.** At least one court has reached the opposite conclusion, and found that, like insurers, HMOs "assume the financial risk of providing benefits to their members," and thus should be considered insurers for purpose of ERISA savings clause. *See Physicians Health Plan v. Citizens Ins. Co.,* 673 F.Supp. 903, 907–08 (W.D.Mich. 1987).

This Court respectfully disagree. New York law defines a health maintenance organization as "any person, natural or corporate, or any groups of such persons who enter into an arrangement, agreement or plan or any combination of arrangements or plans which propose to provide or offer, or which do provide or offer, a comprehensive health services plan." Public Health Law § 4401(1). New York law further defines a comprehensive health services plan as "a plan through which each member of an enrolled population is entitled to receive comprehensive health services in consideration for a basic advance or periodic charge." Thus, unlike the typical insurance arrangement in which a medical insurer merely reimburses the patient for medical costs incurred, an HMO actually provides medical services for a fee.

viduals. Although plaintiffs dispute the degree to which the Surcharges actually achieve their stated goal—to encourage the community rating and open enrollment procedures employed, at least in part, by the Blues—plaintiffs do not deny that, unlike the Blues, most if not all commercial insurers have not adopted those procedures at this time. (*See* HIAA' Reply Brief at 21–22). Thus, plaintiffs cannot dispute that the Blues cover a disproportionate share of high risk individuals.

The Court has already found that increasing hospital rates for individuals covered by commercial insurers will result in an increase in premiums and that the increase in premiums will cause at least some individuals to obtain their insurance through the Blues rather than commercial insurers. Although difficult to quantify at this stage in the litigation, this shift will likely increase the number of Blue Cross and Blue Shield members and spread the risk of high risk individuals among a larger pool. To this extent, therefore, the 11% and 13% Surcharges do have the effect of spreading certain policyholders' risks.[15]

The Surcharges do not, however, satisfy the two other McCarran–Ferguson factors. Neither the 11% nor the 13% Surcharges relate directly to the policy relationship between the insurer and the insured; rather, as noted previously, the statutes are expressly aimed at hospital rates. If the Surcharges directly impact any "relationship" at all, it is the relationship between insurers and hospitals or insureds and hospitals, not that between insurers and their insureds.

The Surcharges are also not limited to the insurance industry. To the contrary, the statutes at issue repeatedly refer to hospitals, HMOs, and self-insured benefit plans—entities which are not directly involved with the issuance of insurance. In addition, the Court has already found that the Surcharges do not merely "regulate insurance." As a result, the Surcharges do not satisfy the third McCarran–Ferguson factor, and are not saved from preemption by the savings clause.[16]

### 3. *Laches*

Intervenor HANYS argues that plaintiffs' challenge to the 13% Surcharge is barred by the doctrine of laches. It is undisputed that New York's hospital-rate setting statute has included a differential between various payors since the early 80's. Despite this long-standing policy, plaintiffs did not contest the differential portion of the statute until the enactment of the 1992 Act and the additional surcharges. Accordingly, HANYS asserts

---

**15.** In support of its claim that the Surcharges do not have a risk-spreading effect, Travelers relies on *Group Life and Health Ins. Co. v. Royal Drug Co., Inc.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), which involved an arrangement under which Blue Shield participants would pay only $2 for prescriptions purchased at "participating pharmacies." The Supreme Court held that the agreements between Blue Shield and the participating pharmacies did not spread any risk because those agreements merely reduced Blue Shield's costs for fulfilling an obligation which Blue Shield had already assumed. 440 U.S. at 212–14, 99 S.Ct. at 1074.

Travelers argues that the Surcharges are similar to the agreements at issue in *Group Life* because they merely increase the costs for certain insurers, but do not affect whether those insurers will assume particular risks. (*See, e.g.,* Travelers' Reply Brief at 10–12). While this may be true, the agreements at issue in *Group Life* do not appear to have had the indirect risk-

spreading effect already discussed. Accordingly, *Group Life* is distinguishable from this case.

**16.** Defendants argue that the 11% Surcharge is "intimately associated with the business of insurance" because "only payments made by commercial insurers are subject to the 11% differential." (Defendants' Reply Brief at 11). In making this argument, defendants imply that the 11% Surcharge is assessed directly against commercial insurers—and involves no other parties. To the contrary, it is undisputed that the 11% Surcharge is imposed on the hospital bill for patients covered by commercial insurers. As a result, even if commercial insurers are forced to pay the Surcharge, the collection of that Surcharge necessarily involves other parties.

More importantly, the Surcharge is not intended to impact "the business of insurance" or the relationship between an insurance company and its insured. Rather, the Surcharge is simply designed to reduce the attractiveness of particular forms of medical coverage, in order to make the Blues more competitive.

that plaintiffs' current challenge to the 13% Surcharge is untimely.

■ A claim will be barred by principles of laches if there is a showing of (1) a lack of diligence by the party against whom the defense is asserted; and (2) prejudice. *Costello v. United States*, 365 U.S. 265, 281–83, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961). *See also Tunis v. Corning Glass Works*, 698 F.Supp. 452, 454 (S.D.N.Y.1988) (laches requires showing of "unreasonabl[e] and inexcusabl[e] delay" and "'substantial' prejudice"). Because the Court does not find that either of these requirements has been satisfied, the doctrine of laches does not preclude plaintiffs' claims with regard to the 13% Surcharge.

HANYS argues that plaintiffs have no excuse for not challenging the 13% Surcharge earlier, particularly since plaintiffs "generally supported the concept of a differential." (HANYS' Brief 27). Plaintiffs strenuously disagree, and contend that they worked actively within the legislative process to have the differential eliminated. (HIAA' Reply Brief at 33).

Without resolving the parties' dispute as to plaintiffs' prior position with regard to the 13% Surcharge, the Court finds that plaintiffs' delay in bringing this action was not unreasonable. New York first enacted the type of statutory hospital reimbursement scheme at issue here in 1983. (Defendants' Brief at 4). That scheme was challenged almost immediately, and one year later, in *Rebaldo*, the Second Circuit held that the statute was not preempted under ERISA. Given that ruling, it was not illogical for plaintiffs to refrain from expending their resources on what would likely be a unsuccessful legal action, and to work within the legislative process instead. Now that *Rebaldo* has, in this Court's view, been undermined by Supreme Court decisions interpreting ERISA's preemption clause, a legal challenge to the Surcharges has obviously become more viable.

The Court also does not find sufficient prejudice to either New York hospitals or the Blues to preclude this action. The Court assumes that hospitals and the Blues have, to a certain extent, relied upon the existence of the 13% Surcharge in making financial decisions. However, the harm that those parties will suffer if plaintiffs succeed here results more from an injunction against the 13% Surcharge rather than plaintiffs' alleged delay in bringing the action. *See Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 65 (1983) (considering prejudice "resulting from the delay").

Since at least 1983, New York's hospital rate-setting statute has not only been continuously modified, it has been substantially amended at least once. (*See* Defendants' Brief at 3–9) (describing history of statute). During that amendment, the "differential" was changed from a 15% discount for the Blues, to the current 13% Surcharge. (*Id.* at 4–5). Thus, while the Blues and hospitals may have considered the existence of a differential for financial planning purposes, given the nature of the statute at issue, they could not have relied upon the exact level of differential or surcharge, and had to have been prepared for further legislative amendments. Accordingly, the Court does not find that the delay between the Supreme Court's most recent rulings on ERISA preemption and the filing of this action has substantially prejudiced any party.

4. *The Federal Employee Health Benefit Act*

■ Defendants have cross-moved for summary judgment on plaintiffs' claims that the 11% and 13% Surcharges are preempted by FEHBA, the statute which governs health benefits for federal employees, claiming that FEHBA only applies to "premium taxes" or taxes on insurance companies measured by premiums. On August 25, 1992, the Office of Personnel Management ("OPM"), the administrative agency which administers the FEHBA program, notified defendants that, in its view, the Surcharges are preempted.[17] (Defen-

---

17. The OPM has indicated that it also considers the 9% Surcharge to be preempted by FEHBA. (Holt Aff. Exs. C and D). Here, however, only

plaintiff Mutual of Omaha ("Mutual") challenges the Surcharges under FEHBA, and Mutual has only raised the issue as to the 11% and

dants' Brief at 48 n. 40). The United States has filed an *amicus* brief in support of OPM's position. (Amicus Brief at 6).

Federal employees are eligible for health benefits through the FEHBA program, and can select coverage from any one of the participating insurance carriers in their region. 5 U.S.C. § 8905. "Contributions" or premiums under the program are assessed against the government and the individual employee, and are then deposited into the Employees Health Benefits Fund (the "Fund"). The FEHBA program is structured so that carriers pay care providers directly for covered treatment, and then are reimbursed by the Fund. 5 U.S.C. § 8909.

FEHBA's preemption provision states that:

> (c) EXEMPTION FROM STATE PREMIUM TAXES,—Section 8909 of title 5, United States Code, is amended by adding at the end the following:
>
> (f)(1) No tax, fee, or other monetary payment may be imposed, directly or indirectly, on a carrier or an underwriting or plan administration subcontractor of an approved health benefits plan by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority thereof, with respect to any payment made from the Fund.
>
> (2) Paragraph (1) shall not be construed to exempt any carrier or underwriting or plan administration subcontractor of an approved health benefits plan from the imposition, payment, or collection of a tax, fee, or other monetary payment on the net income or profit accruing to or realized by such carrier or underwriting or plan administration subcontractor from business conducted under this chapter, if that tax, fee, or payment is applicable to a broad range of business activity. [Pub.L.No. 101–508].

Defendants argue that the language of the statute as well as its legislative history

are unambiguous, and reflect Congress' clear intent that FEHBA preemption apply only to state premium taxes. (Defendants' Brief at 44–45; Blues' Reply Brief at 11). It is well-established that if Congress' intent with regard to a particular issue is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781. If, however, Congress' intent is not clear, district courts should defer to an implementing agency's interpretation of a federal statute, as long as that interpretation is reasonable. *Id.* 467 U.S. at 843–44, 104 S.Ct. at 2782. *See also Presley v. Etowah County Commission,* —— U.S. ——, ——, 112 S.Ct. 820, 831, 117 L.Ed.2d 51 (1992) (same).

Contrary to defendants' arguments, the FEHBA statute itself does not clearly refer to state premium taxes. In fact, other than the heading to the amendment, the provision does not use the term "premium tax," but refers only to a "tax, fee, or other monetary payment" imposed "directly or indirectly" on "any payment made from the Fund." This conflict between the amendment heading and the statutory language alone suggests that Congress' intent is less than clear.

The statute's legislative history is similarly ambiguous. (*See* Amicus Brief at 14) (referring to "sparse" legislative history for preemption provision). Even assuming that Congress intended FEHBA preemption to apply only to premium taxes, the legislative history does not resolve the question whether the 11% and 13% Surcharges qualify as premium taxes within the meaning of the statute.[18]

Because the Court finds that FEHBA's preemption provision and the statute's legislative history are both ambiguous, it will defer to OPM's reasonable interpretation of that clause. In order to be deemed reasonable, the agency's finding need not be "the only possible construction, or ...

---

13% Surcharges. Thus, the Court need not consider the 9% Surcharge in this context.

**18.** The Committee Statements and Reports cited by defendants merely state that FEHBA carriers are exempt from "state premium taxes," but do not define that term.

the same finding the court would have made." *Lipscomb v. United States*, 906 F.2d 545, 548 (11th Cir.1990). Rather, an agency's interpretation may be upheld if it is a "permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782.

It is undisputed that the 11% and 13% Surcharges substantially increase the amount that FEHBA carriers must pay for hospital care rendered to their insureds. Because those carriers are then reimbursed for the payments by the Fund, the Surcharges also serve to increase, at least indirectly, "payments from the Fund." Given these circumstances—and absent any evidence to the contrary—the Court finds that OPM's determination that the Surcharges are preempted under § 8909(f) is a reasonable interpretation of the statute. Accordingly, the Court will defer to that interpretation and finds that the two Surcharges are both preempted under FEHBA as well as ERISA.[19]

### 5. *The Actuarial Letter*

 Finally, plaintiff Travelers challenges Actuarial Information Letter No. 6 (the "Actuarial Letter") issued by the New York State Department of Insurance. (Joseph Aff. Ex. 1). The Actuarial Letter imposes certain requirements on "stop-loss type policies," that is, insurance policies purchased by employee benefit plans to protect themselves against excess or catastrophic losses. Travelers claims that because the Actuarial Letter relates to employee benefit plans within the meaning of ERISA, that letter is also preempted. Defendants disagree, and argue that to the extent that the Actuarial Letter does relate to ERISA plans, it constitutes a regulation of insurance within the meaning of the savings clause.

Items 4 and 7 of the Actuarial Letter mandate the level of runoff reserves and the rate filings to be submitted for stop-loss policies. Because those provisions apply only to the insurance policy and/or insurer, and have no direct or indirect connection with employee benefit plans, they are not preempted by ERISA.

Item 6 provides that "[o]nly appropriate groups will be written, which excludes multiple-employer trusts and associations." Because that provision similarly regulates the insurer, not an ERISA plan, it is also not preempted under the statute.

The remaining items of the Actuarial Letter provide that:

1. The insurer must undertake to ensure that statutorily mandated benefits be covered under the employer's plan;
2. The insurer must agree to ensure that statutory conversion policies be provided, either by them or by another insurer;
3. Notice must be given to employees if and when the insurer becomes liable for runoff claims. We will accept a policy provision which requires the employer to pass along material provided by the insurer for such purposes;

\* \* \* \* \* \*

5. The insurer must take full primary responsibility for the payment of all employer plan claims incurred but not yet paid at date of termination of the policy, unless one of two conditions occurs:

 a) The stop-loss plan is replaced by another stop-loss plan, issued by another carrier, which takes liability on a "paid" (as opposed to "incurred") basis; or

 b) If there is no replacement stop-loss plan, the insurer agrees to determine that the employer's plan has not been eliminated or materially reduced within 90 days (or three months) following termination of the stop-loss contract.

The Court finds that these items do have a connection with ERISA plans given that they attempt to mandate, through the stop-loss insurer, the benefits offered by and the administrative functioning of the ERISA plan purchasing the stop-loss cover-

---

**19.** Defendants do not argue that the Surcharges fall within the exception to FEHBA's preemption clause, which exempts from preemption a "tax, fee, or payment ... applicable to a broad range of business activity."

age. Thus, those provisions will be preempted unless they fall within the savings clause.

As already noted, ERISA's savings clause exempts from preemption any state law which "regulates insurance." However, ERISA's deemer clause limits the scope of the savings clause, stating that "[n]either an employee benefit plan ... nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer ... to be engaged in the business of insurance ... for purposes of any law of any State purporting to regulate insurance companies [or] insurance contracts ..." 29 U.S.C. § 1144(b)(2)(B).

In interpreting the deemer clause, the Supreme Court has held that self-funded ERISA plans are not subject to state laws which otherwise "regulate insurance" within the meaning of the savings clause. *See FMC Corp.*, 498 U.S. at 60, 111 S.Ct. at 409 ("the deemer clause ... exempt[s] self-funded ERISA plans from state laws" regulating insurance). While an insured plan may be indirectly regulated through regulation of its insurer, "if the plan is uninsured, the State may not regulate it" at all. *Id.* 498 U.S. at 64, 111 S.Ct. at 411. *See also Metropolitan Life*, 471 U.S. at 746–48, 105 S.Ct. at 2393 (noting that Court's interpretation of ERISA savings clause leaves insured plans open to indirect regulation through state insurance laws).

It is undisputed that the plan on whose behalf Travelers challenges the Actuarial Letter is self-funded, other than its purchase of stop-loss coverage from Travelers. The question then becomes whether that purchase transforms an otherwise uninsured plan into an insured plan for purposes of ERISA preemption.

Defendants correctly argue that nothing in ERISA "*compels* the conclusion that a plan that purchases excess risk coverage should not be treated as an insured plan."

(Defendants' Brief at 42) (emphasis added). It does not appear that the Second Circuit has ruled on this issue. A number of other courts have, however, and have found that, for ERISA purposes, a plan "remains self-funded even with the stop-loss insurance." *Thompson v. Talquin Building Products Co.*, 928 F.2d 649, 653 (4th Cir.1991). *Accord United Food & Commercial Workers & Employers Arizona Health & Welfare Trust v. Pacyga*, 801 F.2d 1157, 1161–62 (9th Cir.1986) (because no insurance is provided directly to plan participants, plan should not be considered "insured").

The Court agrees. Accordingly, Items 1, 2, 3, and 5 of the Actuarial Letter are preempted by ERISA.[20]

For the foregoing reasons, plaintiffs' motions for summary judgment are granted in part and denied in part, and defendants' cross-motions are denied. Because the Court finds that the three Surcharges are all preempted by ERISA, defendants are enjoined from enforcing those surcharges against any commercial insurers or HMOs in connection with their coverage of any ERISA plans. Because the Court also finds that both the 11% and 13% Surcharges are preempted by FEHBA, defendants are enjoined from enforcing those surcharges against any insurers participating in the FEHBA program. Finally, because the Court finds that Items 1, 2, 3 and 5 of the Actuarial Letter are also preempted under ERISA, defendants are enjoined from enforcing those provisions of the Letter against any commercial insurers providing stop-loss coverage to self-funded ERISA plans.

SO ORDERED.

## MOTION TO STAY

As stated in the Court's prior Orders, this case involves a challenge to three surcharges imposed by New York State on

---

**20.** Defendants further argue that even if the plan at issue is considered self-insured despite its purchase of stop-loss coverage, the Court should not accept Travelers' interpretation of the deemer clause, because that interpretation "would result in the preemption of state insurance laws which have only a tangential effect on

ERISA plans." (Defendants' Brief at 43). While defendants may disagree with such a broad reading of ERISA's preemption provision, that is the Supreme Court's interpretation of the clause, which is obviously binding on this Court.

hospital rates charged to certain categories of payors.[1] On February 3, 1993, the Court granted plaintiffs' motion for summary judgment and enjoined defendants from enforcing the three surcharges on the grounds that they are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA").[2] *See* 29 U.S.C. § 1144(a). Defendants and certain intervenors[3] now move pursuant to Fed.R.Civ.P. 62(c) to stay that ruling pending appeal. For the reasons stated below, the motion to stay is granted in part and denied in part. The Court's Order will be stayed as to the 13% Surcharge, but not as to the 9% and 11% Surcharges. Pending appeal, however, plaintiffs and any other parties subject to the 9% and 11% Surcharges are ordered to pay—or to continue paying—those funds into an interest-bearing escrow account.

## DISCUSSION

The facts of this case were set out fully in the Court's February 3, 1993 Order and Opinion, and will not be restated here.

In this Circuit, four factors must be considered in determining a motion for stay pending appeal: "(1) whether the movant will suffer irreparable injury absent a stay; (2) whether a party will suffer substantial injury if a stay is issued; (3) whether the

movant has demonstrated 'a substantial possibility, although less than a likelihood, of success' on appeal, and (4) the public interests that may be affected."[4] *Hirschfeld v. Board of Elections*, 984 F.2d 35, 39 (2d Cir.1993) (*quoting Hayes v. City University of New York*, 503 F.Supp. 946, 963 (S.D.N.Y.1980)) (other citations omitted). *See also Dubose v. Pierce*, 761 F.2d 913, 920 (2d Cir.1985) (same).

No single factor is dispositive of the stay issue. Rather, a court must balance the equities presented in a particular case, and "explore the relative harms to [the] applicant and respondent, as well as the interests of the public at large." *Barnes v. E–Systems, Inc. Group Hospital Medical and Surgical Ins. Plan*, — U.S. —, —, 112 S.Ct. 1, 3, 115 L.Ed.2d 1087 (1991). *See also Hilton*, 481 U.S. at 777, 107 S.Ct. at 2119 ([T]he traditional stay factors contemplate individualized judgments in each case ...").

With regard to all three Surcharges, the Court finds that defendants do have a substantial possibility of succeeding on appeal. ERISA preemption, the central issue in the case, is a purely legal question, well-suited for resolution by an appellate court. Moreover, the law regarding ERISA preemption has been evolving over the last several years, resulting in several Supreme Court

---

1. Section 2807–c(1)(b) of New York's Public Health Law provides that the hospital rate for inpatient services is increased by 13% for all patients covered by any form of health insurance other than Blue Cross and Blue Shield, a health maintenance organization ("HMO") or a government plan such as Medicare (the "13% Surcharge"). On April 2, 1992, the New York State Legislature adopted the Omnibus Revenue Act of 1992 (the "1992 Act"), which amends the Public Health Law to impose an additional 11% surcharge on rates charged to patients insured by commercial insurers (the "11% Surcharge"), and a 9% surcharge on the hospitalization costs for patients covered by HMOs (the "9% Surcharge").

2. The Court also found that (1) the Tax Injunction Act does not preclude an injunction against the 9% and 11% Surcharges; (2) plaintiffs' claims as to the 13% Surcharge are not barred by the doctrine of laches; (3) both the 11% and 13% Surcharges are preempted by the Federal Employee Health Benefit Act; and (4) certain portions of a Department of Insurance interpretive letter are also preempted by ERISA.

3. New York State Conference of Blue Cross and Blue Shield Plans, Empire Blue Cross and Blue Shield (collectively, "the Blues"), and Hospital Association of New York State ("HANYS").

4. Plaintiffs properly note that other courts have required "a strong showing"—not a mere "possibility"—of success on the merits. *See Hilton v. Braunskill*, 481 U.S. 770, 775–77, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987); *United States v. Eastern Airlines, Inc.*, 923 F.2d 241, 244 (2d Cir.1991); *767 Third Avenue Associates v. Permanent Mission of the Republic of Zaire*, 787 F.Supp. 389, 392 (S.D.N.Y.1992). Given the Second Circuit's reiteration of the applicable rule less than one month ago, this Court is bound by the standard articulated in *Hirschfeld*. In any event, however, the same reasons which support the Court's finding that defendants have demonstrated a possibility of success on appeal also suggest that defendants may in fact be likely to succeed.

decisions. *See FMC Corp. v. Holliday*, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990); *Ingersoll–Rand.Co. v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990). As a result, although the Court abides by the broad reading of ERISA's preemption clause expressed in its February 3, 1993 Order and Opinion, it recognizes that other courts might well disagree.

In addition, the Court's ruling was, to a large extent, based on its finding that the Second Circuit's decision in *Rebaldo v. Cuomo*, 749 F.2d 133 (2d Cir.1984), *cert. denied*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985), has been abrogated by later Supreme Court decisions.[5] Obviously, the Second Circuit may disagree, and may reaffirm its prior ruling.

Under the other factors relevant to a stay, however, the various Surcharges are distinguishable. With respect to the 13% Surcharge, the Court finds that defendants will suffer irreparable harm absent a stay. That Surcharge, which is paid directly to hospitals, has been in effect for approximately ten years. The hospitals, already in a precarious financial position, depend on those funds for their day-to-day operations. Thus, in the absence of some other, immediately available source of income, loss of the 13% Surcharge will cause a substantial and irreparable disruption in the functioning of and services provided by New York's hospitals.

On the other hand, plaintiffs, and the ERISA plans on whose behalf they are acting, will only suffer monetary damages if the Court's Order is stayed pending appeal. In the Court's view, the public interest in financially-stable hospitals and uninterrupted hospital services outweighs that monetary harm, and supports the imposition of a stay as to the 13% Surcharge.

The situation with respect to the 9% and 11% Surcharges is quite different. Those Surcharges, which were imposed by law in 1992, have never been collected by the State. Rather, plaintiffs and other parties subject to the 9% and 11% Surcharges have been paying the funds into escrow pending the outcome of this litigation. Thus, a stay of the Court's Order to permit collection of those Surcharges would alter, not maintain, the status quo between the parties.

More importantly, the Court does not find that defendants or any other party will suffer irreparable harm if its Order regarding the 9% and 11% Surcharges is not stayed. Although defendants claim that the Blues need the financial advantage created by the Surcharges in order to survive, defendants have not taken any action to enforce those Surcharges or to appeal this Court's grant of a preliminary injunction as to the 9% Surcharge. Accordingly, any claim of irreparable harm is undermined by defendants' own actions.

By contrast, plaintiffs have made a strong showing that they would suffer substantial harm if the Court were to stay its ruling. The 9% Surcharge is paid by HMOs directly to the State. Thus, as stated previously, even if a plaintiff were to succeed on the merits of its claims after it has already paid the Surcharge, it would be unable to recover those funds through an action in federal court and would be irreparably injured. *See United States v. New York*, 708 F.2d 92, 93–94 (2d Cir.1983), *cert. denied*, 466 U.S. 936, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984).

The 11% Surcharge is somewhat different in that it is paid by commercial insurers to hospitals, which then transfer the funds to the State. If, however, plaintiffs were to succeed on the merits of their claims, they would be required to sue each hospital individually in order to recover any money improperly paid—a substantial burden.

Finally, the Court does not find that the public interest favors a stay. While citizens of New York would generally benefit from the increase in state revenues resulting from the 9% and 11% Surcharges, participants in the ERISA plans which are the ultimate source of those funds will suffer

---

**5.** In *Rebaldo,* the Second Circuit found that New York's prior hospital rate-setting statute, which granted patients covered by Blue Cross a 12–

15% discount on their hospital rates, was not preempted by ERISA.

corresponding harm. Under these circumstances, a stay would not be appropriate.

For the foregoing reasons, defendants' motion to stay the Court's February 3, 1993 Order pending appeal is granted in part and denied in part. The Order will be stayed as to the 13% Surcharge, but not as to the 9% or 11% Surcharges. However, plaintiffs and any other parties subject to the 9% or 11% Surcharges shall pay those funds into an interest-bearing escrow account pending resolution of defendants' appeal.

SO ORDERED.